# Exhibit C



Appraisal Institute®
*Professionals Providing Real Estate Solutions*

# Real Estate Damages

**Third Edition**

By Randall Bell, PhD, MAI

Appraisal Institute®
*Professionals Providing Real Estate Solutions*

# Real Estate Damages

**Third Edition**

By Randall Bell, PhD, MAI

Appraisal Institute • 200 W. Madison • Suite 1500 • Chicago, IL 60606 • www.appraisalinstitute.org

The Appraisal Institute advances global standards, methodologies, and practices through the professional development of property economics worldwide.

*Reviewers:* Michael S. MaRous, MAI, SRA
Nick A. Tillema, MAI, SRA, AI-GRS, AI-RRS
Larry T. Wright, MAI, SRA, AI-GRS

*Chief Executive Officer:* Frederick H. Grubbe, MBA, CAE
*Director of Professional Services and Resources:* Evan R. Williams, CAE, IOM
*Senior Manager, Publications:* Stephanie Shea-Joyce
*Senior Technical Book Editor:* Emily Ruzich
*Manager, Book Design/Production:* Michael Landis

**For Educational Purposes Only**

The materials presented in this text represent the opinions and views of the author. Although these materials may have been reviewed by members of the Appraisal Institute, the views and opinions expressed herein are not endorsed or approved by the Appraisal Institute as policy unless adopted by the Board of Directors pursuant to the Bylaws of the Appraisal Institute. While substantial care has been taken to provide accurate and current data and information, the Appraisal Institute does not warrant the accuracy or timeliness of the data and information contained herein. Further, any principles and conclusions presented in this publication are subject to court decisions and to local, state and federal laws and regulations and any revisions of such laws and regulations.

This book is sold for educational and informational purposes only with the understanding that the Appraisal Institute is not engaged in rendering legal, accounting or other professional advice or services. Nothing in these materials is to be construed as the offering of such advice or services. If expert advice or services are required, readers are responsible for obtaining such advice or services from appropriate professionals.

**Nondiscrimination Policy**

The Appraisal Institute advocates equal opportunity and nondiscrimination in the appraisal profession and conducts its activities in accordance with applicable federal, state, and local laws.

© 2016 by the Appraisal Institute, an Illinois not for profit corporation. All rights reserved. No part of this publication may be reproduced, modified, rewritten, or distributed, either electronically or by any other means, without the express written permission of the Appraisal Institute.

**Library of Congress Cataloging-in-Publication Data**

Names: Bell, Randall, author.
Title: Real estate damages / by Randall Bell, PhD, MAI.
Description: Third edition. | Chicago, IL : Appraisal Institute, [2016] |
Includes bibliographical references and index.
Identifiers: LCCN 2016013284 | ISBN 9781935328667
Subjects: LCSH: Real property--Valuation--United States. | Damages--United
States. | Real property--Valuation--United States--Case studies.
Classification: LCC HD1389.5.U6 B45 2016 | DDC 333.33/2--dc23 LC record available at
https://lccn.loc.gov/2016013284

Copyrighted material licensed by John A. Kilpatrick, Ph.D. on February 28, 2017

# Introduction

# Fundamentals of Property Valuation

The events that make newspaper headlines and lead news updates at the top of the hour often involve death and destruction—floods, earthquakes, tornadoes, terrorist attacks, environmental contamination, crime, and catastrophic disasters. The list goes on and on. In the aftermath of a damaging event, firefighters put out the fires and rescue the victims, paramedics treat the survivors, police arrest the criminals, lawyers have trials, and reporters tell the stories. Many of these events are very emotional for the participants involved. These situations also involve practical considerations, including the impact that the event may have on property values.

An old and oversimplified real estate adage states that real estate values are driven by "location, location, location." Clearly, there are many important issues in real estate other than location. One way to view the concept of "value" is to consider that the needs, tastes, fears, sensitivities, desires, and anticipations of sellers and buyers are being translated into a number or price. To accurately analyze real estate, one must be able to monitor and interpret the actions of the participants in the market. After all, properties do not deal with one another, but people do. When carefully considered, all the factors that have an influence on a property's desirability, and therefore its value, are traced back to the market's perceptions. To truly understand real estate valuation, one must conscientiously focus on and measure these perceptions. Buyers typically want the largest discounts they can get for damaged real estate. On the other hand, sellers are often resilient and often want to maximize their sales prices. This interplay of interests is an important ingredient for studying real estate damage economics. In fact, a more accurate adage may be that real estate values are driven by "perception, perception, perception."

To understand perceptions within the real estate market, market data must be used to measure how the market actually reacts. A property is considered "innocent" until a negative impact is demonstrated through an analysis of relevant market data. The simple assumption that an incident caused a diminution in value is one of the most common errors in the field. These are sometimes called

Copyrighted material licensed by John A. Kilpatrick, PhD February 28, 2017

Ultimately, the project incentive reflects the certainty of the repairs being completed on time and on budget, the time needed to manage or oversee the repair process, and the general financial profit or incentive necessary to accept responsibility for the repair process. This could be similar to purchasing a car when it is known that the car needs a new transmission. While the situation is fully assessed and characterized, a financial or profit incentive may be required for the buyer to purchase the car knowing that a repair is required along with all the associated problems and risks of completing the repairs. On the other hand, the repair may be inconsequential because the market would pay full value despite the fact that a small repair must be made. Market data is required to support the conclusion reached.

*Market resistance* refers to the risks and uncertainties, if any, associated with the negative reactions by the market towards a property that has a history of being damaged. For example, deep groundwater contamination usually does not interfere with the use of improved commercial or industrial properties. Hence, the market may reflect that net operating income (*NOI*) is unaffected by the detrimental condition, and there is no risk or uncertainty that *NOI* will be affected in the future. In this situation, there may be no market resistance if both the lenders and the equity market do not require any premium on the loan terms.

Alternatively, a ground subsidence issue may have been adequately addressed at an improved industrial property, and the *NOI* may be unaffected by the property's history. There may be a significant risk, however, that the problem could reoccur. If it did reoccur, use of the property would be significantly affected. In this case, the value of the property may reflect this type of risk or uncertainty.

Related to market resistance are any risks and uncertainties associated with third-party liability. This consideration relates primarily to litigation risk that is somehow associated with the detrimental condition. An example of a situation in which this kind of risk can occur is an environmental case in which the contamination has migrated from the source site to neighboring properties. In this case, the source site property owner may face liability with respect to lawsuits brought by neighboring property owners, even if those lawsuits have no merit.

In other situations, there may be no assessment stage or repair stage, but only market resistance that is attributable to a negative event, such as a crime that occurred on the property. In these situations, market resistance reflects any risks associated with the history of the property. Going back again to the example of a car, this would be similar to buyer resistance toward a car that was damaged in an accident and later repaired. Depending on the situation, the market may require a discount as an incentive to purchase the car, given its history.

The most important consideration in evaluating potential risk, stigma, or market resistance is to support opinions with relevant market data. The discovery or disclosure of a current or prior detrimental condition does not automatically result in value diminution, and it is incumbent upon the appraiser or analyst to provide proper support for any opinions related to market resistance.

Copyrighted material licensed to John A. Kilpatrick, PhD, February 28, 2017

brick mortar was improperly mixed and left a poor cosmetic result, or a high-rise condominium that was built visibly out of plumb. Finding comparable sales or case studies involving similarly impacted properties might be virtually impossible, yet a legitimate diminution in value may exist.

In these types of unusual situations, a market survey might be a valid means to query property owners and brokers and determine their perspectives and perceptions relative to the effect on value, if any. Additionally, a market survey may be used as secondary or supporting documentation for primary market data. However, a survey should not be the sole method used when relevant market data is available. In other words, prior to relying solely upon a survey method, an analyst should make a full search for relevant transactional data and exhaust other alternatives.

Formal market surveys are typically distinguished by structured and standardized questions and may include a statistical analysis of survey responses. It is important that any survey, formal or informal, be conducted in such a manner as to elicit objective responses with attention to both thoroughness and brevity. Surveys can be administered in person or using a variety of methods, including the telephone, mail, or the Internet.

Surveys have the advantage of allowing for large samples and statistical testing of results. However, surveys can also be criticized for not being truly reflective of the market, as the person conducting the survey may collect data based on expectations and perceptions rather than actual transactions or observed behavior. The use of surveys to estimate risk or stigma, particularly in cases involving environmental contamination and other detrimental conditions, is a relatively new concept and has proven to be controversial. This concern is often justified, as environmental and other issues are so common that more relevant transactional market data can usually be found.

A particular concern with some surveys is *hypothetical bias*, which is the potential error that arises from not confronting an individual with a real situation. Hypothetical bias is problematic, since there are no economic consequences to respondents who overstate or understate values in a hypothetical scenario.

Formal surveys are often pretested to assess objectivity and respondent comprehension and are redesigned as needed to enhance understanding by participants. The selection of a representative sample, the response rate, the elimination of ambiguity and bias in the survey instrument, and the accurate documentation of responses are of particular importance. Furthermore, the analyst should understand the overall viewpoints or agendas of the parties, such as any significant political or community issues.

Two specialized survey techniques are *contingent valuation* and *conjoint analysis*; both utilize survey data from participants responding to hypothetical scenarios.

### Contingent Valuation

Contingent valuation (CV) surveys were first proposed in theory as far back as 1947 as an alternative for valuing public goods that are not typically bought and sold in the marketplace. The first practical application of this methodology involved the economic value of a Maine wilderness area to hunters and tourists

Copyrighted material licensed by John A. Kilpatrick, Ph.D on February 28, 2017

6

# Building and Manufacturing Conditions

Class VI detrimental conditions are those conditions that are associated with the construction of improvements, such as construction defects, Americans with Disabilities Act (ADA) non-compliance, deferred maintenance, and functional obsolescence.

A basic premise of Class VI detrimental conditions is that they are man-made, which generally means that they can be physically repaired. However, these conditions may or may not be able to be repaired economically. (See Exhibit 6.1 for a diagram of common construction terms.) Often the full value of the property is restored upon the completion of repairs. Sometimes the problems are self-evident, and no special studies are required to determine the scope of the problem; however, all detrimental condition stages and issues should be addressed.

Like most detrimental conditions, quantifying construction-related conditions requires a careful study of market perceptions and reactions. As construction issues are relatively common, case studies and market data are generally available. Value diminution may include the cost of repairs and engineering as well as related costs for tenant relocation, lost rent while repairs are being made, post-repair cleanup, etc. Some tenant relocation costs can be partially, if not entirely, mitigated simply by waiting until the property is vacant to make the repairs.

Consider the example of the Ashby Building, a three-story mixed-use complex in Eugene, Oregon. The ground level has retail uses, while the upper levels have mixed office and apartment uses. The building was constructed in 1991 with a frame-and-stucco design. The builder failed to install the insulation required by the architectural plans, and as a result the property is very "energy inefficient." In addition, the building is noisy, with sound traveling between rooms because of the lack of insulation. Most of the tenants have lodged complaints with the owner over these issues.

The economics of the situation must be examined carefully. If the damages cannot be fully repaired economically, there may be an ongoing condition that results in a diminution in value, if this is supported by the market. For the Ashby Building, the income levels would need to justify the intrusive repairs required