# Exhibit 3

to

Declaration of Nina Fields Britt

in Opposition to Defendant's Motion to Exclude Expert Opinions of Dr. John A. Kilpatrick

**Appraisal of Real Property**

**By J. Carl Schultz, Jr., MAI, CRE, SRA, FRICS**

**Park Trace Apartments**

**700 Atlanta Ave., Decatur, GA 30030**

**(November 1, 2013)**

**Integra Realty Resources**
Atlanta

**Appraisal of Real Property**

**Park Trace Apartments**
Multifamily Property
700 Atlanta Avenue
Decatur, DeKalb County, Georgia 30030

**Prepared For:**
Smith, Currie & Hancock LLP

**Effective Date of the Appraisal:**
November 1, 2013

**Report Format:**
Appraisal Report – Standard Format

**IRR - Atlanta**
File Number: 101-2015-0369



PENGAD 800-631-6989
PLAINTIFF'S EXHIBIT
3







**Park Trace Apartments**
700 Atlanta Avenue
Decatur, Georgia

Integra Realty Resources
Atlanta

[illegible] Peachtree Street [illegible]
Suite 350
Atlanta, CA 30309-[illegible]

[illegible].835.[illegible]
F 404.3[illegible]3.723[illegible]
[illegible]irr.com

August 4, 2015

John M. Mastin, Jr.
Partner
Smith, Currie & Hancock LLP
2700 Marquis One Tower
Atlanta, GA 30303

SUBJECT: Market Value Appraisal
Park Trace Apartments
700 Atlanta Avenue
Decatur, DeKalb County, Georgia 30030
IRR - Atlanta File No. 101-2015-0369

Dear Mr. Mastin:

Integra Realty Resources – Atlanta is pleased to submit the accompanying appraisal of the referenced property. The purpose of the appraisal is to develop an opinion of the market value of the leased fee interest in the property and the impact of the subject property's differential soil settlement on the market resistance (stigma) after repairs are completed. The client for the assignment is Smith, Currie & Hancock LLP and the intended use is for potential litigation.

The appraisal is intended to conform with the Uniform Standards of Professional Appraisal Practice (USPAP), the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute, and applicable state appraisal regulations.

To report the assignment results, we use the Appraisal Report option of Standards Rule 2-2(a) of the 2014-2015 edition of USPAP. As USPAP gives appraisers the flexibility to vary the level of information in an Appraisal Report depending on the intended use and intended users of the appraisal, we adhere to the Integra Realty Resources internal standards for an Appraisal Report – Standard Format. This type of report has a moderate level of detail. It summarizes the information analyzed, the appraisal methods employed, and the reasoning that supports the analyses, opinions, and conclusions. It meets or exceeds the former

Summary Appraisal Report requirements that were contained in the 2012-2013 edition of USPAP.

The subject is an existing multifamily property containing 170 dwelling units. The improvements were constructed in 1984 and were 96% leased as of the effective appraisal date. The site area is 3.7 acres or 161,172 square feet. The subject is project-based Section 8.

Based on the valuation analysis in the accompanying report, and subject to the definitions, assumptions, and limiting conditions expressed in the report, our opinion of value is as follows:

**Value Conclusions**

| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
|---|---|---|---|
| Market Value | Leased Fee | November 1, 2013 | $11,000,000 |
| Estimated Market Resistance (Stigma) of 30% | Leased Fee | November 1, 2013 | $3,300,000 |

**Extraordinary Assumptions and Hypothetical Conditions**

The value conclusions are subject to the following extraordinary assumptions that may affect the assignment results. An extraordinary assumption is uncertain information accepted as fact. If the assumption is found to be false as of the effective date of the appraisal, we reserve the right to modify our value conclusions.

1. That the effective date of the appraisal, November 1, 2013, is prior to the differential soil settlement of the subject improvements.
2. That the property does not suffer from significant deferred maintenance based on the May 2, 2013 Drucker & Falk, LLC Maintenance Inspection.

The value conclusions are based on the following hypothetical conditions that may affect the assignment results. A hypothetical condition is a condition contrary to known fact on the effective date of the appraisal but is supposed for the purpose of analysis.

1. The market resistance (stigma) percentage estimate is applied to the value before the differential soil settlement but assumes the necessary repairs will be completed. Since the repairs had not be completed as of 11/1/2013, this is considered a Hypothetical Condition.

The opinions of value expressed in this report are based on estimates and forecasts that are prospective in nature and subject to considerable risk and uncertainty. Events may occur that could cause the performance of the property to differ materially from our estimates, such as changes in the economy, interest rates, capitalization rates, financial strength of tenants, and behavior of investors, lenders, and consumers. Additionally, our opinions and forecasts are based partly on data obtained from interviews and third party sources, which are not always completely reliable. Although we are of the opinion that our findings are reasonable based on available evidence, we are not responsible for the effects of future occurrences that cannot reasonably be foreseen at this time.

If you have any questions or comments, please contact the undersigned. Thank you for the opportunity to be of service.

Respectfully submitted,

**Integra Realty Resources - Atlanta**

Sherry L. Watkins, MAI, FRICS, ASA
Senior Managing Director
Certified General Real Estate Appraiser
GA Certificate # CG1536
Telephone: 404-836-7925
Email: swatkins@irr.com

J. Carl Schultz, Jr., MAI, CRE, SRA, CRE, FRICS
Director
Certified General Real Estate Appraiser
GA Certificate # CG818
Telephone: 404-836-7922
Email: cschultz@irr.com

# Table of Contents


**Summary of Salient Facts and Conclusions** 1

**General Information** 2
- Identification of Subject 2
- Current Ownership and Sales History 2
- Purpose of the Appraisal 2
- Definition of Market Value 3
- Definition of As Is Market Value 3
- Definition of Property Rights Appraised 3
- Intended Use and User 4
- Applicable Requirements 4
- Report Format 4
- Prior Services 4
- Scope of Work 5

**Economic Analysis** 7
- DeKalb County Area Analysis 7
- Surrounding Area Analysis 15
- Multifamily Market Analysis 18

**Property Analysis** 19
- Land Description and Analysis 19
- Improvements Description and Analysis 22
- Real Estate Taxes 29
- Highest and Best Use 30

**Valuation** 32
- Valuation Methodology 32
- Sales Comparison Approach 33
  - Analysis and Adjustment of Sales 37
  - Value Indication 41
- Income Capitalization Approach 42
  - Occupancy and Rental Rates 42
  - Market Rent Analysis 43
  - Stabilized Income and Expenses 44
  - Capitalization Rate Selection 47
  - Direct Capitalization Analysis 49
- Reconciliation and Conclusion of Value 50
  - Exposure and Marketing Times 51
- Market Resistance (Stigma) 52
  - Market Participant Interviews 61

**Certification** 66

**Assumptions and Limiting Conditions** 68

**Addenda**
- A. Appraiser Qualifications
- B. Comparison of Report Formats
- C. Financials and Property Information
- D. Comparable Data
- E. Third Party Reports
- F. Witness Testimony /Compensation
- G. Engagement Letter

# Summary of Salient Facts and Conclusions

| | |
|---|---|
| Property Name | Park Trace Apartments |
| Address | 700 Atlanta Avenue |
| | Decatur, DeKalb County, Georgia 30030 |
| Property Type | Multifamily - Affordable Housing |
| Owner of Record | Ashton Park Trace Apartments, LLC |
| Tax ID | 15 245 02 033 |
| Land Area | 3.70 acres; 161,172 SF |
| Number of Units | 170 |
| Gross Building Area | 109,962 SF |
| Rentable Floor Area | 86,970 SF |
| Percent Leased | 96% |
| Year Built | 1984 |
| Zoning Designation | RHM, Multiple Family Residential (High Rise) |
| Highest and Best Use - As if Vacant | Multifamily use |
| Highest and Best Use - As Improved | Continued multifamily use |
| Exposure Time; Marketing Period | 9 months; 9 months |
| Date of the Report | August 4, 2015 |

**Value Conclusions**

| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
|---|---|---|---|
| Market Value | Leased Fee | November 1, 2013 | $11,000,000 |
| Estimated Market Resistance (Stigma) of 30% | Leased Fee | November 1, 2013 | $3,300,000 |

The values reported above are subject to the definitions, assumptions, and limiting conditions set forth in the accompanying report of which this summary is a part. No party other than Smith, Currie & Hancock LLP and the Georgia Federal Court may use or rely on the information, opinions, and conclusions contained in the report. It is assumed that the users of the report have read the entire report, including all of the definitions, assumptions, and limiting conditions contained therein.

## Extraordinary Assumptions and Hypothetical Conditions

The value conclusions are subject to the following extraordinary assumptions that may affect the assignment results. An extraordinary assumption is uncertain information accepted as fact. If the assumption is found to be false as of the effective date of the appraisal, we reserve the right to modify our value conclusions.

1. That the effective date of the appraisal, November 1, 2013, is prior to the differential soil settlement of the subject improvements.
2. That the property does not suffer from significant deferred maintenance based on the May 2, 2013 Drucker & Falk, LLC Maintenance Inspection.

The value conclusions are based on the following hypothetical conditions that may affect the assignment results. A hypothetical condition is a condition contrary to known fact on the effective date of the appraisal but is supposed for the purpose of analysis.

1. The market resistance (stigma) percentage estimate is applied to the value before the differential soil settlement but assumes the necessary repairs will be completed. Since the repairs had not be completed as of 11/1/2013, this is considered a Hypothetical Condition.

# General Information

## Identification of Subject

The subject is an existing multifamily property containing 170 dwelling units. The improvements were constructed in 1984 and were 96% leased as of the effective appraisal date. The site area is 3.7 acres or 161,172 square feet. The subject is project-based Section 8. A legal description of the property is in the addenda.

| Property Identification | |
|---|---|
| Property Name | Park Trace Apartments |
| Address | 700 Atlanta Avenue<br>Decatur, Georgia 30030 |
| Tax ID | 15 245 02 033 |

## Current Ownership and Sales History

The owner of record is Ashton Park Trace Apartments, LLC. This party acquired the property from Ashton Park Trace, LLC on December 16, 2010 for a price of $10,600,000. The transaction is recorded in Deed Book 22305, Page 610, of the DeKalb County public records. Reportedly, the down payment was $2,331,400 and the remainder of the $10,600,000 purchase price was a loan assumption. The interest rate was 5.54% fixed with a ten-year term. There was a 1% of the principal balance prepayment penalty; however, currently the prepayment penalty does not exist. The sale appears to be a market level transaction.

To the best of our knowledge, no other sale or transfer of ownership has occurred within the past three years, and as of the effective date of this appraisal, the property is not subject to an agreement of sale or option to buy, nor is it listed for sale.

Additionally, the subject has a project-based Section 8 Housing Assistance Program (HAP) contract. Reportedly, the contract expired June 26, 2014 but has been renewed until 2019. One hundred percent of the subject units are under the HAP contract. The 2013 contract rents were $878 for the studio, $948 for the one bedroom units, and $1,000 for the two bedroom units.

## Purpose of the Appraisal

The purpose of the appraisal is to develop an opinion of the market value of the leased fee interest in the property as of the effective date of the appraisal, November 1, 2013.The date of the report is August 4, 2015. The appraisal is valid only as of the stated effective date or dates. It is also the purpose of this appraisal to estimate the loss in value resulting from the anticipated market resistance (stigma) due to the differential soil settlement, extraordinary costs to restore and refurbish and lack of any guarantee that settling will not reoccur in the future.

### Stigma

*The Dictionary of Real Estate Appraisal, Fifth Edition, Appraisal Institute, Chicago, Illinois, 2010;* stigma is the adverse public perception regarding a property; the identification of a property with a condition (e.g. environment contamination, a grisly crime) that exacts a penalty on the marketability of the property and may also result in diminution of value.

## Definition of Market Value

Market value is defined as:

"The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

- Buyer and seller are typically motivated;
- Both parties are well informed or well advised, and acting in what they consider their own best interests;
- A reasonable time is allowed for exposure in the open market;
- Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
- The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale."

*(Source: Code of Federal Regulations, Title 12, Chapter I, Part 34.42[g]; also Interagency Appraisal and Evaluation Guidelines, Federal Register, 75 FR 77449, December 10, 2010, page 77472)*

## Definition of As Is Market Value

As is market value is defined as, "The estimate of the market value of real property in its current physical condition, use, and zoning as of the appraisal's effective date."

*(Source: The Dictionary of Real Estate Appraisal, Fifth Edition, Appraisal Institute, Chicago, Illinois, 2010; also Interagency Appraisal and Evaluation Guidelines, Federal Register, 75 FR 77449, December 10, 2010, page 77471)*

## Definition of Property Rights Appraised

Fee simple estate is defined as, "Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat."

Leased fee interest is defined as, "A freehold (ownership interest) where the possessory interest has been granted to another party by creation of a contractual landlord-tenant relationship (i.e., a lease)."

Leasehold interest is defined as, "The tenant's possessory interest created by a lease."

Lease is defined as, "A contract in which rights to use and occupy land or structures are transferred by the owner to another for a specified period of time in return for a specified rent."

*(Source: The Dictionary of Real Estate Appraisal, Fifth Edition, Appraisal Institute, Chicago, Illinois, 2010)*

## Intended Use and User

The intended use of the appraisal is for potential litigation. The client and intended user is Smith, Currie & Hancock LLP, and other intended users are the Georgia Federal Court. The appraisal is not intended for any other use or user. No party or parties other than Smith, Currie & Hancock LLP and the Georgia Federal Court may use or rely on the information, opinions, and conclusions contained in this report.

## Applicable Requirements

This appraisal is intended to conform to the requirements of the following:

- Uniform Standards of Professional Appraisal Practice (USPAP);
- Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute;
- Applicable state appraisal regulations;

## Report Format

This report is prepared under the Appraisal Report option of Standards Rule 2-2(a) of the 2014-2015 edition of USPAP. As USPAP gives appraisers the flexibility to vary the level of information in an Appraisal Report depending on the intended use and intended users of the appraisal, we adhere to the Integra Realty Resources internal standards for an Appraisal Report – Standard Format. This type of report has a moderate level of detail. It summarizes the information analyzed, the appraisal methods employed, and the reasoning that supports the analyses, opinions, and conclusions. It meets or exceeds the former Summary Appraisal Report requirements that were contained in the 2012-2013 edition of USPAP. For additional information, please refer to Addendum B – Comparison of Report Formats.

## Prior Services

USPAP requires appraisers to disclose to the client any other services they have provided in connection with the subject property in the prior three years, including valuation, consulting, property management, brokerage, or any other services. We have not performed any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

## Scope of Work

To determine the appropriate scope of work for the assignment, we considered the intended use of the appraisal, the needs of the user, the complexity of the property, and other pertinent factors. Our concluded scope of work is described below. and in several places in the valuation approaches.

### Valuation Methodology

Appraisers usually consider the use of three approaches to value when developing a market value opinion for real property. These are the cost approach, sales comparison approach, and income capitalization approach. Use of the approaches in this assignment is summarized as follows:

**Approaches to Value**

| Approach | Applicability to Subject | Use in Assignment |
|---|---|---|
| Cost Approach | Not Applicable | Not Utilized |
| Sales Comparison Approach | Applicable | Utilized |
| Income Capitalization Approach | Applicable | Utilized |

The **income capitalization approach** is the most reliable valuation method for the subject due to the following:

- The probable buyer of the subject would base a purchase price decision primarily on the income generating potential of the property and an anticipated rate of return.
- Sufficient market data regarding income, expenses, and rates of return, is available for analysis.

The **sales comparison approach** is an applicable valuation method because:

- There is an active market for similar properties, and sufficient sales data is available for analysis.
- This approach directly considers the prices of alternative properties having similar utility.

The **cost approach** is not applicable to the assignment considering the following:

- The age of the property would limit the reliability of an accrued depreciation estimate.
- There are limited land transactions in the market area of the subject, making estimates of underlying land value subjective.
- This approach is not typically used by market participants, except for new or nearly new properties.

## Research and Analysis

The type and extent of our research and analysis is detailed in individual sections of the report. This includes the steps we took to verify comparable sales, which are disclosed in the comparable sale profile sheets in the addenda to the report. Although we make an effort to confirm the arms-length nature of each sale with a party to the transaction, it is sometimes necessary to rely on secondary verification from sources deemed reliable.

## Inspection

Sherry L. Watkins, MAI, FRICS, ASA, conducted an interior and exterior inspection of the property on May 27, 2015. J. Carl Schultz, Jr., MAI, CRE, SRA, CRE, FRICS, conducted an interior and exterior inspection on May 21, 2015.

Interior inspections by Sherry L. Watkins, MAI, FRICS, ASA included a total of 6 units, representing the following unit types: studio, 1 br / 1 ba.

# Economic Analysis

## DeKalb County Area Analysis

DeKalb County is located in north central Georgia approximately 2.5 miles east of Atlanta. It is 268 square miles in size and has a population density of 2,650 persons per square mile. DeKalb County is part of the Atlanta-Sandy Springs-Marietta, GA Metropolitan Statistical Area, hereinafter called the Atlanta MSA, as defined by the U.S. Office of Management and Budget.

### Population

DeKalb County has an estimated 2013 population of 709,142, which represents an average annual 0.8% increase over the 2010 census of 691,893. DeKalb County added an average of 5,750 residents per year over the 2010-2013 periods, but its annual growth rate lagged the Atlanta MSA rate of 1.2%.

**Population Trends**

| | Population | | | Compound Ann. % Chng | |
|---|---|---|---|---|---|
| | 2010 Census | 2013 Est. | 2018 Est. | 2010 - 2013 | 2013 - 2018 |
| DeKalb County | 691,893 | 709,142 | 740,833 | 0.8% | 0.9% |
| Atlanta MSA | 5,268,860 | 5,464,971 | 5,787,210 | 1.2% | 1.2% |

Source: Claritas

Looking forward, DeKalb County's population is projected to increase at a 0.9% annual rate from 2013-2018, equivalent to the addition of an average of 6,338 residents per year. DeKalb County's growth rate is expected to lag that of the Atlanta MSA, which is projected to be 1.2%.

### Employment

Trends in employment are a key indicator of economic health and strongly correlate with real estate demand. Total employment in DeKalb County is currently estimated at 276,210 jobs. Between year-end 2002 and the present, employment declined by 22,195 jobs, equivalent to a 7.4% loss over the entire period. There were declines in employment in seven out of the past ten years, influenced in part by two national economic downturns during this time. Recently no clear trend has emerged, either positive or negative, but there was a net gain in jobs over the 2011-2012 period.

Although many areas suffered drops in employment over the last decade, DeKalb County underperformed the Atlanta MSA, which experienced an increase in employment of 1.8% or 39,304 jobs over this period. Employment data is shown in the table that follows.

**Employment Trends**

| | Total Employment (Year End) | | | | Unemployment Rate (Ann. Avg.) | |
|---|---|---|---|---|---|---|
| Year | DeKalb County | % Change | Atlanta MSA | % Change | DeKalb County | Atlanta MSA |
| 2002 | 298,405 | | 2,177,846 | | 5.5% | 4.9% |
| 2003 | 295,154 | -1.1% | 2,177,700 | 0.0% | 5.4% | 4.8% |
| 2004 | 295,508 | 0.1% | 2,230,650 | 2.4% | 5.4% | 4.7% |
| 2005 | 294,983 | -0.2% | 2,288,054 | 2.6% | 6.0% | 5.3% |
| 2006 | 284,215 | -3.7% | 2,342,486 | 2.4% | 5.1% | 4.7% |
| 2007 | 300,048 | 5.6% | 2,361,533 | 0.8% | 4.9% | 4.5% |
| 2008 | 293,684 | -2.1% | 2,266,012 | -4.0% | 6.4% | 6.2% |
| 2009 | 278,874 | -5.0% | 2,144,306 | -5.4% | 9.9% | 9.8% |
| 2010 | 275,142 | -1.3% | 2,161,513 | 0.8% | 10.6% | 10.2% |
| 2011 | 278,615 | 1.3% | 2,204,824 | 2.0% | 10.1% | 9.6% |
| 2012* | 276,210 | -0.9% | 2,217,150 | 0.6% | 9.1% | 8.7% |
| Overall Change 2002-2012 | -22,195 | -7.4% | 39,304 | 1.8% | | |
| Avg Unemp. Rate 2002-2012 | | | | | 7.1% | 6.7% |
| Unemployment Rate - May 2013 | | | | | 8.6% | 8.2% |

*Total employment data is as of June 2012; unemployment rate data reflects the average of 12 months of 2012.

Source: Bureau of Labor Statistics and Economy.com. Employment figures are from the Quarterly Census of Employment and Wages (QCEW). Unemployment rates are from the Current Population Survey (CPS). The figures are not seasonally adjusted.

Unemployment rate trends are another way of gauging an area's economic health. Over the past decade, the DeKalb County unemployment rate has been consistently higher than that of the Atlanta MSA, with an average unemployment rate of 7.1% in comparison to a 6.7% rate for the Atlanta MSA. This is another indication of weakness in the DeKalb County economy over the longer term.

Recent data shows that the DeKalb County unemployment rate is 8.6% in comparison to a 8.2% rate for the Atlanta MSA, a negative sign that is consistent with the fact that DeKalb County has underperformed the Atlanta MSA in the rate of job growth over the past two years.

## Employment Sectors

The composition of the DeKalb County job market is depicted in the chart below. A complete data set is not available for the Atlanta MSA, so we will compare DeKalb County to the United States. Total employment for the two areas is broken down by major employment sector, and the sectors are ranked from largest to smallest based on the percentage of DeKalb County jobs in each category.

**Employment Sectors - 2012**




Source: Bureau of Labor Statistics and Economy.com

DeKalb County has greater concentrations than the United States in the following employment sectors:

1. Trade; Transportation; and Utilities, representing 20.1% of DeKalb County payroll employment compared to 19.0% for the nation overall. This sector includes jobs in retail trade, wholesale trade, trucking, warehousing, and electric, gas, and water utilities.
2. Education and Health Services, representing 19.1% of DeKalb County payroll employment compared to 14.5% for the nation overall. This sector includes employment in public and private schools, colleges, hospitals, and social service agencies.
3. Government, representing 17.2% of DeKalb County payroll employment compared to 15.9% for the nation overall. This sector includes employment in local, state, and federal government agencies.
4. Professional and Business Services, representing 14.8% of DeKalb County payroll employment compared to 13.5% for the nation overall. This sector includes legal, accounting, and engineering firms, as well as management of holding companies.

DeKalb County is underrepresented in the following sectors:

1. Leisure and Hospitality, representing 9.2% of DeKalb County payroll employment compared to 10.8% for the nation overall. This sector includes employment in hotels, restaurants, recreation facilities, and arts and cultural institutions.
2. Financial Activities, representing 4.9% of DeKalb County payroll employment compared to 5.7% for the nation overall. Banking, insurance, and investment firms are included in this sector, as are real estate owners, managers, and brokers.
3. Manufacturing, representing 4.6% of DeKalb County payroll employment compared to 9.0% for the nation overall. This sector includes all establishments engaged in the manufacturing of durable and nondurable goods.
4. Construction, representing 3.1% of DeKalb County payroll employment compared to 4.3% for the nation overall. This sector includes construction of buildings, roads, and utility systems.

## Major Employers

Major employers in DeKalb County are shown in the following table.

**Major Employers - DeKalb County**

| | Name |
|---|---|
| 1 | AT&T Services, Inc. |
| 2 | Childrens Healthcare |
| 3 | DeKalb Medical Center |
| 4 | Emory Healthcare |
| 5 | Emory University |
| 6 | Georgia Perimeter College |
| 7 | Publix |
| 8 | Kroger |
| 9 | United Parcel Service |
| 10 | Walmart |

Source: Georgia Department of Labor

## Gross Domestic Product

Gross Domestic Product (GDP) is a measure of economic activity based on the total value of goods and services produced in a defined geographic area. Although GDP figures are not available at the county level, data reported for the Atlanta MSA is considered meaningful when compared to the nation overall, as DeKalb County is part of the MSA and subject to its influence.

Economic growth, as measured by annual changes in GDP, has been somewhat lower in the Atlanta MSA than the United States overall during the past eight years. The Atlanta MSA has grown at a 0.8% average annual rate while the United States has grown at a 1.0% rate. As the national economy recovers from the downturn of 2008-2009, the Atlanta MSA has recently performed better than the

United States. GDP for the Atlanta MSA rose by 2.2% in 2011 while the United States GDP rose by 1.5%.

The Atlanta MSA has a per capita GDP of $46,557, which is 11% greater than the United States GDP of $42,070. This means that Atlanta MSA industries and employers are adding relatively more value to the economy than their counterparts in the United States overall.

**Gross Domestic Product**

| Year | ($ Mil) Atlanta MSA | % Change | ($ Mil) United States | % Change |
|---|---|---|---|---|
| 2004 | 235,847 | | 12,199,532 | |
| 2005 | 243,788 | 3.4% | 12,539,116 | 2.8% |
| 2006 | 249,546 | 2.4% | 12,875,816 | 2.7% |
| 2007 | 257,238 | 3.1% | 13,103,341 | 1.8% |
| 2008 | 254,002 | -1.3% | 13,016,791 | -0.7% |
| 2009 | 236,564 | -6.9% | 12,527,057 | -3.8% |
| 2010 | 244,055 | 3.2% | 12,918,931 | 3.1% |
| 2011 | 249,509 | 2.2% | 13,108,674 | 1.5% |
| Compound % Chg (2004-2011) | | 0.8% | | 1.0% |
| GDP Per Capita 2011 | $46,557 | | $42,070 | |

Source: Bureau of Economic Analysis and Economy.com; data released February 2013. The release of state and local GDP data has a longer lag time than national data.

The figures in the table above represent inflation adjusted "real" GDP stated in 2005 dollars.

## Household Income

DeKalb County has a considerably lower level of household income than the Atlanta MSA. Median household income for DeKalb County is $42,444, which is 16.8% less than the corresponding figure for the Atlanta MSA.

**Median Household Income - 2013**

| | Median |
|---|---|
| DeKalb County | $42,444 |
| Atlanta MSA | $51,006 |
| Comparison of DeKalb County to Atlanta MSA | - 16.8% |

Source: Claritas

The following chart shows the distribution of households across twelve income levels. DeKalb County has a greater concentration of households in the lower income levels than the Atlanta MSA. Specifically, 42% of DeKalb County households are below the $35,000 level in household income as compared to 35% of Atlanta MSA households. A lesser concentration of households is apparent in the higher income levels, as 25% of DeKalb County households are at the $75,000 or greater levels in household income versus 32% of Atlanta MSA households.

Household Income Distribution - 2013




Source: Claritas

## Education and Age

Residents of DeKalb County have a higher level of educational attainment than those of the Atlanta MSA. An estimated 38% of DeKalb County residents are college graduates with four-year degrees, versus 34% of Atlanta MSA residents. People in DeKalb County are slightly younger than their Atlanta MSA counterparts. The median age for DeKalb County is 35 years, while the median age for the Atlanta MSA is 36 years.

Education & Age - 2013




Source: Claritas

## Conclusion

The national economic downturn of 2008-2009 had a greater impact on DeKalb County than on many areas of the country.

Over the long term, DeKalb County will be affected by a growing population base and a higher level of educational attainment. DeKalb County experienced a decline in the number of jobs, and had a consistently higher unemployment rate than the Atlanta MSA over the past decade. However, DeKalb County benefits from being part of the Atlanta MSA, which is the ninth most populous metropolitan area in the country, and generates a higher level of GDP per capita than the nation overall. Considering all positive and negative factors, we anticipate that growth in DeKalb County will be limited, resulting in a modest level of demand for real estate in general.

## Area Map


Subject Property
700 Atlanta Ave
Decatur, GA 30030
Marietta
Sandy Springs
Dunwoody
Smyrna
North Atlanta
Tucker
Mableton
Atlanta
Stone Mountain
Redan
East Point
College Park
Hapeville
Forest Park
Conley
Lawrenceville
Snellville
Conyers
Lithonia
Doraville
Chamblee

## Surrounding Area Analysis

### Location

The subject property is located in the western area of DeKalb County within the city limits of Decatur. The subject is located near the new City of Decatur Beacon Municipal Center.

### Access and Linkages

Primary highway access to the area is via Highway 278. Public transportation is provided by MARTA and provides access to the subject's area. Overall, the primary mode of transportation in the area is the automobile.

### Demand Generators

Major employers include AT&T Services, Inc., Children's Healthcare of Atlanta, DeKalb Medical Center, Inc., Emory Healthcare, Inc., Emory University, Georgia Perimeter College, State Farm Mutual Auto Insurance Company, The Kroger Company, United Parcel Service and Walmart. These are located in DeKalb County.

### Demographics

A demographic profile of the surrounding area, including population, households, and income data, is presented in the following table.

**Surrounding Area Demographics**

| 2013 Estimates | 1-Mile Radius | 3-Mile Radius | 5-Mile Radius | DeKalb County | Atlanta MSA |
|---|---|---|---|---|---|
| Population 2010 | 9,121 | 97,456 | 261,097 | 691,893 | 5,268,860 |
| Population 2013 | 9,158 | 98,192 | 264,388 | 709,142 | 5,464,971 |
| Population 2018 | 9,306 | 100,333 | 271,917 | 740,833 | 5,787,210 |
| Compound % Change 2010-2013 | 0.0% | 0.1% | 0.1% | 0.2% | 0.3% |
| Compound % Change 2013-2018 | 0.3% | 0.4% | 0.6% | 0.9% | 1.2% |
| | | | | | |
| Households 2010 | 3,935 | 39,051 | 104,634 | 271,809 | 1,937,225 |
| Households 2013 | 4,041 | 39,964 | 107,700 | 281,123 | 2,014,249 |
| Households 2018 | 4,183 | 41,364 | 112,293 | 296,029 | 2,138,519 |
| Compound % Change 2010-2013 | 0.2% | 0.2% | 0.2% | 0.3% | 0.3% |
| Compound % Change 2013-2018 | 0.7% | 0.7% | 0.8% | 1.0% | 1.2% |
| | | | | | |
| Median Household Income 2013 | $39,292 | $34,638 | $37,110 | $42,444 | $51,006 |
| Average Household Size | 2.3 | 2.3 | 2.4 | 2.5 | 2.7 |
| College Graduate % | 37% | 32% | 35% | 38% | 34% |
| Median Age | 40 | 37 | 36 | 35 | 36 |
| Owner Occupied % | 64% | 55% | 55% | 57% | 66% |
| Renter Occupied % | 36% | 45% | 45% | 43% | 34% |
| Median Owner Occupied Housing Value | $168,781 | $161,347 | $158,514 | $168,909 | $166,740 |
| Median Year Structure Built | 1961 | 1967 | 1971 | 1980 | 1990 |
| Avg. Travel Time to Work in Min. | 33 | 33 | 33 | 33 | 33 |

Source: Claritas

As shown above, the current population within a 3-mile radius of the subject is 98,192, and the average household size is 2.3. Population in the area has grown since the 2010 census, and this trend is projected to continue over the next five years. Compared to DeKalb County overall, the population within a 3-mile radius is projected to grow at a slower rate.

Median household income is $34,638, which is lower than the household income for DeKalb County. Residents within a 3-mile radius have a lower level of educational attainment than those of DeKalb County, while median owner occupied home values are lower.

## Land Use

The area is suburban in character and approximately 80% developed.

Land uses immediately surrounding the subject are predominantly commercial with typical ages of building improvements ranging from new to 50 years. Property types adjoining the subject include MARTA, City of Decatur Beacon Municipal Center, Ebster Park and pool, and multifamily.

## Outlook and Conclusions

The area is in the mature stage of its life cycle. Recently, the city of Decatur has undergone revitalization. The gentrification that began prior to the Great Recession and stalled during the economic downturn is increasing. We anticipate that property values will increase in the near future.

## Surrounding Area Map



## Multifamily Market Analysis

The subject is located in the Decatur/Avondale multifamily submarket. Supply and demand indicators pertaining to all classes of properties are summarized in the following table.

**Decatur/Avondale Submarket**

| Year | Quarter | Inventory (Units) | Completions (Units) | Vacancy % | Absorption (Units) | Effective Rental Rate | % Change |
|---|---|---|---|---|---|---|---|
| 2006 | Annual | 16,249 | 0 | 9.3% | -179 | $731 | -0.1% |
| 2007 | Annual | 16,349 | 100 | 8.2% | 270 | $737 | 0.8% |
| 2008 | Annual | 15,917 | 0 | 10.9% | -826 | $733 | -0.5% |
| 2009 | Annual | 15,917 | 0 | 11.8% | -143 | $730 | -0.4% |
| 2010 | Annual | 16,027 | 110 | 10.3% | 337 | $737 | 0.9% |
| 2011 | Annual | 16,027 | 0 | 9.4% | 144 | $756 | 2.6% |
| 2012 | Annual | 16,027 | 0 | 8.4% | 153 | $759 | 0.5% |
| 2013 | Annual | 16,470 | 443 | 10.1% | 134 | $777 | 2.4% |
| 2014 | Annual | 16,470 | 0 | 8.4% | 280 | $789 | 1.6% |
| 2015 | 1 | 16,470 | 0 | 7.5% | 148 | $792 | |

Source: REIS, Inc.; compiled by Integra Realty Resources, Inc.

In 2013, the vacancy rate increased to 10.1%. There were 443 units completed in 2013 which skewed upward the vacancy rate.

The average effective rental rate has been increasing since 2010. Rent escalated 2.4% in 2013.

Overall, market conditions are stable, and rental rates are increasing.

# Property Analysis

## Land Description and Analysis

| Land Description | |
|---|---|
| Land Area | 3.70 acres; 161,172 SF |
| Land Area (Usable) | 3.70 acres; 161,172 SF |
| Source of Land Area | Public records |
| Primary Street Frontage | Atlantic Avenue - approximately 168 feet |
| Shape | Irregular |
| Corner | No |
| Topography | On a plateau above the Beacon Hill Municipal Complex |
| Drainage | No problems reported or observed |
| Environmental Hazards | None reported or observed |
| Ground Stability | No problems reported or observed as of the valuation date; however, the engineer reported differential soil settlement after the valuation date. |
| Flood Area Panel Number | 13089C0068J |
| Date | May 16, 2013 |
| Zone | X |
| Description | Outside of 500-year floodplain |
| Insurance Required? | No |
| **Zoning; Other Regulations** | |
| Zoning Jurisdiction | City of Decatur |
| Zoning Designation | RHM |
| Description | Multiple Family Residential (High Rise) |
| Legally Conforming? | Yes |
| Zoning Change Likely? | No |
| Permitted Uses | multifamily |
| Other Land Use Regulations | None |
| **Utilities** | |
| Service | Provider |
| Water | DeKalb Water & Sewer |
| Sewer | DeKalb Water & Sewer |
| Electricity | Georgia Power |
| Natural Gas | Gerogia Natural Gas |
| Local Phone | Various |

### Potential Development Density

Based on the maximum density under zoning and densities of similar sites, it appears that 170 dwelling units could be developed on the site if it were vacant. This compares with the subject's actual development of 170 units.

### Rent Control Regulations

Additionally, the subject has a project-based Section 8 Housing Assistance Program (HAP) contract. Reportedly, the contract expired June 26, 2014 but has been renewed until 2019. One hundred percent of the subject units are under the HAP contract. The 2013 contract rents were $878 for the studio, $948 for the one bedroom units, and $1,000 for the two bedroom units.

### Easements, Encroachments and Restrictions

We were not provided a current title report to review. We are not aware of any easements, encroachments, or restrictions that would adversely affect value. Our valuation assumes no adverse impacts from easements, encroachments, or restrictions, and further assumes that the subject has clear and marketable title.

### Conclusion of Land Analysis

Overall, the physical characteristics of the site and the availability of utilities result in functional utility suitable for a variety of uses including those permitted by zoning. We are not aware of any other particular restrictions on development.

## Aerial



## Improvements Description and Analysis

The subject is an existing multifamily property containing 170 dwelling units. The improvements were constructed in 1984 and were 96% leased as of the effective appraisal date. The site area is 3.7 acres or 161,172 square feet. The subject is project-based Section 8.

| Improvements Description | |
|---|---|
| Name of Property | Park Trace Apartments |
| General Property Type | Multifamily |
| Property Sub Type | Affordable Housing |
| Competitive Property Class | C |
| Occupancy Type | Multi-Tenant |
| Percent Leased | 96% |
| Number of Buildings | 1 |
| Stories | 8 |
| Construction Class | C |
| Construction Type | Masonry |
| Construction Quality | Average |
| Condition | Below Average |
| Number of Units | 170 |
| Units per Acre (Density) | 45.9 |
| Gross Building Area (SF) | 109,962 |
| Rentable Floor Area (SF) | 86,970 |
| Land Area (SF) | 161,172 |
| Floor Area Ratio (RFA/Land SF) | 0.54 |
| Floor Area Ratio (GBA/Land SF) | 0.68 |
| Building Area Source | Public Records for GBA and Rent Roll for RFA |
| Year Built | 1984 |
| Actual Age (Yrs.) | 29 |
| Estimated Effective Age (Yrs.) | 25 |
| Estimated Economic Life (Yrs.) | 50 |
| Remaining Economic Life (Yrs.) | 25 |
| Number of Parking Spaces | 89 |
| Parking Type | Surface |
| Parking Spaces/Unit | 0.5 |

| Construction Details | |
|---|---|
| Foundation | Reinforced concrete |
| Structural Frame | CMU walls |
| Exterior Walls | Stucco |
| Roof | Ballasted single-ply roof system |
| Heating | PTAC in multifamily units, 5 roof mounted units for common areas. |
| Air Conditioning | PTAC in multifamily units, 5 roof mounted units for common areas. |
| Elevators | 2 |
| Sprinklers | Yes |

## Unit Mix and Building Areas

| Unit Type | Units | % of Total | Avg. Unit Size | Total SF | Occupied Units* | Vacant Units | % Occupied |
|---|---|---|---|---|---|---|---|
| Studio | 42 | 24.7% | 420 | 17,640 | 39 | 3 | 93% |
| 1 BR / 1 BA | 127 | 74.7% | 540 | 68,580 | 124 | 3 | 98% |
| 2 BR / 1 BA | 1 | 0.6% | 750 | 750 | 1 | 0 | 100% |
| TOTAL/AVG. | 170 | 100.0% | 512 | 86,970 | 164 | 6 | 96% |

*Includes employee and model units, as applicable.

## Unit Features and Project Amenities

| Unit Features | At Subject | Project Amenities | At Subject |
|---|---|---|---|
| Patio/Balcony | | Gated Entrance | |
| Fireplace | | Swimming Pool | |
| Vaulted Ceilings | | Spa/Hot Tub | |
| Dishwasher | | Sauna | |
| Disposal | | Covered Parking | |
| Trash Compactor | | Garage/Under Building | |
| Washer/Dryer Hookup | | Tennis Court | |
| Washer/Dryer In Unit | | Playground | |
| Storage in Unit | | Clubhouse/Rec. Building | x |
| Air Conditioning | x | Fitness Room | |
| Carpets/Drapes/Blinds | x | Racquet Ball | |
| Walk-in Closets | | Volleyball | |
| | | Basketball | |
| | | Laundry Facility | x |
| | | Storage | |
| | | Security | x |

## Improvements Analysis

### Quality and Condition

The quality and condition of the subject is considered to be consistent with that of competing properties.

### Functional Utility

The improvements appear to be adequately suited to their current use, and there do not appear to be any significant items of functional obsolescence.

### Deferred Maintenance

It is assumed there is no substantial deferred maintenance as of the effective date of this valuation.

### ADA Compliance

Based on our inspection and information provided, we are not aware of any ADA issues. However, we are not expert in ADA matters, and further study by an appropriately qualified professional would be recommended to assess ADA compliance.

### Hazardous Substances

An environmental assessment report was not provided for review and environmental issues are beyond our scope of expertise. No hazardous substances were observed during our inspection of the improvements; however, we are not qualified to detect such substances. Unless otherwise stated, we assume no hazardous conditions exist on or near the subject.

### Personal Property

No personal property items were observed that would have any material contribution to market value.

## Conclusion of Improvements Analysis

In comparison to other competitive properties in the region, the subject improvements are rated as follows:

| Improvements Ratings | |
|---|---|
| Design and Appearance | Average |
| Age/Condition | Average |
| Room Sizes and Layouts | Below Average |
| Bathrooms | Average |
| Kitchens | Below Average |
| Landscaping | Average |
| Unit Features | Average |
| Project Amenities | Below Average |

Overall, the quality, condition, and functional utility of the improvements are average for their age and location.



Front and side elevation
(Photo Taken on 5/21/2015 and 5/27/2015)



Rear elevation
(Photo Taken on 5/21/2015 and 5/27/2015)



Side elevation
(Photo Taken on 5/21/2015 and 5/27/2015)



View from front parking lot
(Photo Taken on 5/21/2015 and 5/27/2015)



Street scene, subject on the left
(Photo Taken on 5/21/2015 and 5/27/2015)



Street scene, subject on the right
(Photo Taken on 5/21/2015 and 5/27/2015)



Student kitchen in unit undergoing repairs
(Photo Taken on 5/21/2015 and 5/27/2015)



Leasing office kitchen
(Photo Taken on 5/21/2015 and 5/27/2015)



Leasing office, bathroom
(Photo Taken on 5/21/2015 and 5/27/2015)



Typical bathroom
(Photo Taken on 5/21/2015 and 5/27/2015)



Leasing office
(Photo Taken on 5/21/2015 and 5/27/2015)



Unit under repair
(Photo Taken on 5/21/2015 and 5/27/2015)




Signage
(Photo Taken on 5/21/2015 and 5/27/2015)



Lobby
(Photo Taken on 5/21/2015 and 5/27/2015)



Community room
(Photo Taken on 5/21/2015 and 5/27/2015)



Repairs underway
(Photo Taken on 5/21/2015 and 5/27/2015)



Crack monitoring
(Photo Taken on 5/21/2015 and 5/27/2015)



Repairs underway
(Photo Taken on 5/21/2015 and 5/27/2015)

## Floor Plans

PARKTRACE APARTMENTS
700 ATLANTA AVE.
DECATUR GA. 30030



STUDIO APARTMENT
420 SQ FEET



ONE-BEDROOM APARTMENT
540 SQ FEET

## Real Estate Taxes

In Georgia, the Assessor estimates the Fair Market Value (FMV) of a property. The Assessor's FMV estimate for the subject is $9,059,600, thus the subject's assessed value is $3,623,840 (40% of $9,059,600). The amount of the tax is based on 100% of the assessed value of the property and the millage rate, which is set by various taxing authorities. The City of Decatur taxes are assessed at 50% of the Fair Market Value. We have used the 40% assessment in the chart below for the City of Decatur and DeKalb County.

Real estate taxes and assessments for the current tax year are shown in the following table.

**Taxes and Assessments - 2013**

| | Assessed Value | | | Taxes and Assessments | | | |
|---|---|---|---|---|---|---|---|
| Tax ID | Land | Improvements | Total | Tax Rate | Ad Valorem Taxes | Direct Assessments | Total |
| 15 245 02 033 | $887,640 | $2,736,200 | $3,623,840 | 5.455500% | $197,699 | $2,025 | $199,724 |

**Assessor's Market Value**

| Tax ID | Land | Improvements | Total |
|---|---|---|---|
| 15 245 02 033 | $2,219,100 | $6,840,500 | $9,059,600 |

**Direct Assessment Detail**

| Tax ID | Item 1 | Total |
|---|---|---|
| 15 245 02 033 | $2,025 | $2,025 |

Based on the concluded market value of the subject, the assessed value appears low.

# Highest and Best Use

## Process

Before a property can be valued, an opinion of highest and best use must be developed for the subject site, both as if vacant, and as improved or proposed. By definition, the highest and best use must be:

- Physically possible.
- Legally permissible under the zoning regulations and other restrictions that apply to the site.
- Financially feasible.
- Maximally productive, i.e., capable of producing the highest value from among the permissible, possible, and financially feasible uses.

## As If Vacant

### Physically Possible

The physical characteristics of the site do not appear to impose any unusual restrictions on development. The property is 3.7 acres. The site has good visibility. The site has approximately 168 feet of frontage along Atlanta Avenue. The site is not located in a flood plain according to FEMA community panel number 13089C0068J, dated May 16, 2013. Overall, the physical characteristics of the site and the availability of utilities result in functional utility suitable for a variety of uses.

### Legally Permissible

The site is zoned RHM, Multiple Family Residential (High Rise). Permitted uses include multifamily. To our knowledge, there are no legal restrictions such as easements or deed restrictions that would effectively limit the use of the property. Given prevailing land use patterns in the area, only multifamily use is given further consideration in determining highest and best use of the site, as though vacant.

### Financially Feasible

Based on our analysis of the market, there is currently adequate demand for multifamily use in the subject's area. It appears that a newly developed multifamily use on the site would have a value commensurate with its cost. Therefore, multifamily use is considered to be financially feasible.

### Maximally Productive

There does not appear to be any reasonably probable use of the site that would generate a higher residual land value than multifamily use. Accordingly, it is our opinion that multifamily use, developed to the normal market density level permitted by zoning, is the maximally productive use of the property.

### As Improved

The subject site is developed with a 170-unit apartment complex, which is consistent with the highest and best use of the site as if it were vacant.

The existing improvements are currently leased and produce a significant positive cash flow that we expect will continue. Therefore, a continuation of this use is concluded to be financially feasible.

Based on our analysis, there does not appear to be any alternative use that could reasonably be expected to provide a higher present value than the current use, and the value of the existing improved property exceeds the value of the site, as if vacant. For these reasons, continued multifamily use is concluded to be maximally productive and the highest and best use of the property as improved.

### Most Probable Buyer

Taking into account the size and characteristics of the property and its multitenant occupancy, the likely buyer is a local / regional / national investor such as an individual / partnership.

# Valuation

## Valuation Methodology

Appraisers usually consider three approaches to estimating the market value of real property. These are the cost approach, sales comparison approach and the income capitalization approach.

The **cost approach** assumes that the informed purchaser would pay no more than the cost of producing a substitute property with the same utility. This approach is particularly applicable when the improvements being appraised are relatively new and represent the highest and best use of the land or when the property has unique or specialized improvements for which there is little or no sales data from comparable properties.

The **sales comparison approach** assumes that an informed purchaser would pay no more for a property than the cost of acquiring another existing property with the same utility. This approach is especially appropriate when an active market provides sufficient reliable data. The sales comparison approach is less reliable in an inactive market or when estimating the value of properties for which no directly comparable sales data is available. The sales comparison approach is often relied upon for owner-user properties.

The **income capitalization approach** reflects the market's perception of a relationship between a property's potential income and its market value. This approach converts the anticipated net income from ownership of a property into a value indication through capitalization. The primary methods are direct capitalization and discounted cash flow analysis, with one or both methods applied, as appropriate. This approach is widely used in appraising income-producing properties.

Reconciliation of the various indications into a conclusion of value is based on an evaluation of the quantity and quality of available data in each approach and the applicability of each approach to the property type.

The methodology employed in this assignment is summarized as follows:

**Approaches to Value**

| Approach | Applicability to Subject | Use in Assignment |
|---|---|---|
| Cost Approach | Not Applicable | Not Utilized |
| Sales Comparison Approach | Applicable | Utilized |
| Income Capitalization Approach | Applicable | Utilized |

## Sales Comparison Approach

The sales comparison approach develops an indication of value by comparing the subject to sales of similar properties. The steps taken to apply this approach are:

- Identify relevant property sales;
- Research, assemble, and verify pertinent data for the most relevant sales;
- Analyze the sales for material differences in comparison to the subject;
- Reconcile the analysis of the sales into a value indication for the subject.

To apply the sales comparison approach, we searched for sale transactions most relevant to the subject in terms of property type, location, size, age, quality, and transaction date.

The comparable search included CoStar for Georgia properties that are government subsidized. Due to the dearth of sales of project-based Section 8 apartments, the search parameters were expanded to include sale comparables within Integra Realty Resources (IRR) data base of government subsidized properties, primarily in the southeast. There were no applicable recent sales in the IRR database of high rise government subsidized properties in the Southeast. Therefore, the sales utilized include one property in the Atlanta MSA which is not project-based Section 8 but does have 55% of the tenants with Section 8 vouchers, and garden style apartments throughout the East Coast which are project-based Section 8 properties.

For this area of the subject, we use price per unit as the appropriate unit of comparison because market participants typically compare sale prices and property values on this basis. The most relevant sales are summarized in the following table.

**Summary of Comparable Improved Sales**

| No. | Name/Address | Sale Date; Status | Yr. Built; # Stories; % Occ. | # Units; Rentable SF; Avg Unit SF | Effective Sale Price | $/Unit; $/SF | NOI/Unit; NOI/SF; Exp. Ratio | Cap Rate; EGIM |
|---|---|---|---|---|---|---|---|---|
| 1 | Meridian Pointe<br>1470 Boggs Rd.<br>Duluth<br>Gwinnett County<br>GA | Oct-13<br>Closed | 1991<br>2<br>95% | 164<br>226,105<br>1,377 | $10,350,000 | $63,110<br>$45.78 | $3,806<br>$2.76<br>61% | 6.03%<br>6.5 |
| | *Comments: This is the sale of a 164 unit multifamily complex that was 98% occupied at the time of sale. The cap rate on inplace income including reserves and higher taxes and vacancy of 5% is 6.03%. The property has 55% of the tenants with Section 8 vouchers.* | | | | | | | |
| 2 | Oakwood Villa<br>8201 Kona Ave.<br>Jacksonville<br>Duval County<br>FL | Apr-13<br>Closed | 1972<br>2<br>93% | 200<br>149,240<br>746 | $8,650,000 | $43,250<br>$57.96 | $3,501<br>$4.69<br>49% | 8.10%<br>6.4 |
| | *Comments: This was a 1031 exchange reported to have no effect on the sales price. The Special Warranty Deed indicates a sales price of $8,400,000 with an additional $200,000 paid by the buyer for FF&E (appliances) items. The seller paid a $50,000 real estate commission, which reflects an overall sales price of $8,650,000. The seller also had a 2nd offer at $9,000,000. The property was not listed for sale on the market.* | | | | | | | |
| 3 | Mill Pond Apartments<br>30 Washington St.<br>Taunton<br>Bristol County<br>MA | Dec-12<br>Closed | 1983<br>3<br>100% | 49<br>39,726<br>636 | $3,110,000 | $63,469<br>$78.29 | –<br>–<br>– | –<br>– |
| | *Comments: This represents the sale of a 49 unit affordable housing complex situated on Washington Street in Taunton, Bristol County, MA. The property is fully occupied by elderly and disabled tenants paying 30% AMI with the balance of the rental rate paid in the form of HUD subsidies. The purchase priced of $3,110,000 consisted of a $2,932,330 cash payment plus the assumption of an existing $177,670 mortgage with undisclosed terms.* | | | | | | | |
| 4 | 135th St. Apartments<br>2860 NW. 135th St.<br>Opa Locka<br>Miami-Dade County<br>FL | Nov-12<br>Closed | 1968<br>2<br>95% | 65<br>44,310<br>682 | $2,643,250 | $40,665<br>$59.65 | $3,943<br>$5.78<br>65% | 9.70%<br>3.6 |
| | *Comments: This property sold for $40,665 per unit. The occupancy at the time of contract was 100%, with a waiting list. The financials for this sale are based on the actual historicals and IRR appraisal. The property had a HAP contract renewal on 10/2009 through 9/2014. Management was based on 5.0% and reserves at $300/unit.* | | | | | | | |
| 5 | Taylor Apartments<br>131 E. 15th St.<br>Apopka<br>Orange County<br>FL | Aug-12<br>Closed | 1970<br>2<br>95% | 101<br>67,250<br>666 | $4,284,000 | $42,416<br>$63.70 | $2,890<br>$4.34<br>64% | 6.81%<br>5.3 |
| | *Comments: This property reportedly sold for $42,416 per unit and is 99% leased at the time of contract. The financials for the sale are based on the T-5 and budget. We have included the proposed real estate taxes post sale, management at 5.0%, and reserves at $250/unit.* | | | | | | | |
| 6 | Perrywood Garden<br>301 Mayberry Dr.<br>Aberdeen<br>Harford County<br>MD | Feb-12<br>Closed | 1972<br>3<br>97% | 184<br>137,080<br>745 | $10,000,000 | $54,348<br>$72.95 | $5,365<br>$7.20<br>39% | 9.87%<br>6.2 |
| | *Comments: Although the property had not received significant renovations, the kitchen cabinets and countertops were updated in approximately 90% of the units according to the on-site maintenance manager. At the time of sale, however, the overall condition of the property was fair to average, with some deferred maintenance issues regarding concrete sidewalks and asphalt parking lots. HAP rents were $670 for 1BRs and $783 for 2BRs. According to the prospective purchaser, the community will renew the HAP contract for another 5 to 20 years upon expiration in 2014. Furthermore, the prospective purchaser indicated that no renovations are planned for the project. Cap rate of 9.87% represents the buyer's pro forma, while the cap rate based on T-12 through October 2011 was 7.95%.* | | | | | | | |
| | **Subject**<br>Park Trace Apartments<br>Decatur, GA | | 1984<br>8<br>96% | 170<br>86,970<br>512 | | | $4,646<br>$9.08<br>58% | |

## Comparable Improved Sales Map





Sale 1
Meridian Pointe



Sale 2
Oakwood Villa Apartments



Sale 3
Mill Pond Apartments



Sale 4
135th St. Apartments



Sale 5
Taylor Apartments



Sale 6
Perrywood Garden Apartments

## Analysis and Adjustment of Sales

The sales are compared to the subject and adjusted to account for material differences that affect value. Adjustments are considered for the following factors, in the sequence shown below.

| Adjustment Factor | Accounts For | Comments |
|---|---|---|
| Effective Sale Price | Atypical economics of a transaction, such as excess land or non-realty components. | |
| Real Property Rights | Leased fee, fee simple, leasehold, partial interest, etc. | |
| Financing Terms | Seller financing, or assumption of existing financing, at non-market terms. | |
| Conditions of Sale | Extraordinary motivation of buyer or seller. | |
| Market Conditions | Changes in the economic environment over time that affect the appreciation and depreciation of real estate. | All of the sales except Sale 1 require positive market condition adjustments for improving market conditions. |
| Location | Market or submarket area influences on sale price; surrounding land use influences. | |
| Project Size | Inverse relationship that often exists between project size and unit value. | Sales 3 and 4 require negative adjustments for much smaller project size. |
| Quality | Construction quality, market appeal, functional utility. | All of the comparables require positive adjustments since they are not high rise improvements. |
| Age/Condition | Effective age; physical condition. | Sales 2, 4, 5, and 6 require positive adjustments for inferior age/condition. |
| Unit Features | Features internal to the dwelling units such as appliances | Sale 1 requires downward adjustment for superior unit features. |
| Project Amenities | Amenities available to the entire property. | Sales 1 and 6 require downward adjustment for superior project amenities. Sales 2 and 3 require upward adjustment for inferior project amenities. |

| Adjustment Factor | Accounts For | Comments |
|---|---|---|
| Average Unit Size | Average dwelling unit floor area. | All of the comparables require negative adjustments for larger average unit sizes. |
| Economic Characteristics | Non-stabilized occupancy, above/below market rents, rent control, and other economic factors. | Sales 1, 2, 4, and 5 require positive adjustments for superior NOI per unit. Sale 6 requires negative adjustments for superior NOI per unit. |

The following table summarizes the adjustments we make to each sale.

**Improved Sales Adjustment Grid**

| | Subject | Comparable 1 | Comparable 2 | Comparable 3 | Comparable 4 | Comparable 5 | Comparable 6 |
|---|---|---|---|---|---|---|---|
| Property Name | Park Trace Apartments | Meridian Pointe | Oakwood Villa Apartments | Mill Pond Apartments | 135th St. Apartments | Taylor Apartments | Perrywood Garden |
| Address | 700 Atlanta Avenue | 1470 Boggs Rd. | 8201 Kona Ave. | 30 Washington St. | 2860 NW. 135th St. | 131 E. 15th St. | 301 Mayberry Dr. |
| City | Decatur | Duluth | Jacksonville | Taunton | Opa Locka | Apopka | Aberdeen |
| County | DeKalb | Gwinnett | Duval | Bristol | Miami-Dade | Orange | Harford |
| State | Georgia | GA | FL | MA | FL | FL | MD |
| Sale Date | | Oct-13 | Apr-13 | Dec-12 | Nov-12 | Aug-12 | Feb-12 |
| Sale Status | | Closed | Closed | Closed | Closed | Closed | Closed |
| Sale Price | | $10,350,000 | $8,400,000 | $3,110,000 | $2,643,250 | $4,284,000 | $10,000,000 |
| Description of Adjustment | | | Appliances & Commissions | | | | |
| Effective Sale Price | | $10,350,000 | $8,650,000 | $3,110,000 | $2,643,250 | $4,284,000 | $10,000,000 |
| Rentable Floor Area | 86,970 | 226,105 | 149,240 | 39,726 | 44,310 | 67,250 | 137,080 |
| Number of Units | 170 | 164 | 200 | 49 | 65 | 101 | 184 |
| Year Built | 1984 | 1991 | 1972 | 1983 | 1968 | 1970 | 1972 |
| Occupancy | 96% | 95% | 93% | 100% | 95% | 95% | 97% |
| Avg SF Per Unit | 512 | 1,377 | 746 | 636 | 682 | 666 | 745 |
| NOI per Unit | $4,646 | $3,806 | $3,501 | – | $3,943 | $2,890 | $5,365 |
| Price per Unit | | $63,110 | $43,250 | $63,469 | $40,665 | $42,416 | $54,348 |
| Property Rights | | Leased Fee | Leased Fee | Leased Fee | Leased Fee | Leased Fee | Leased Fee |
| Adjustment | | | | | | | |
| Financing Terms | | | Assumption | Assumption | Cash to seller | Cash to seller | |
| Adjustment | | | | | | | |
| Conditions of Sale | | | | | | | |
| Adjustment | | | | | | | |
| Market Conditions | 11/1/2013 | Oct-13 | Apr-13 | Dec-12 | Nov-12 | Aug-12 | Feb-12 |
| Adjustment | | | + | + | ++ | ++ | ++ |
| Location | | | | | | | |
| Project Size | | | | - | - | | |
| Age/Condition | | | + | | + | + | + |
| Quality | | ++ | ++ | ++ | ++ | ++ | ++ |
| Unit Features | | - | | | | | |
| Project Amenities | | - | + | + | | | - |
| Unit Size | | --- | - | - | - | - | - |
| Economic Characteristics | | + | ++ | | + | +++ | -- |
| Overall Adjustment | | -- | ++++++ | ++ | ++++ | +++++++ | + |
| Indicated Value | | $62,000 | | | | | |

Adjustments for unit features and project amenities are based on information in the following table.

**Unit Features and Project Amenities**

| | Subject | Sale 1 | Sale 2 | Sale 3 | Sale 4 | Sale 5 | Sale 6 |
|---|---|---|---|---|---|---|---|
| Unit Features | | | | | | | |
| Patio/Balcony | | x | | | | | |
| Fireplace | | | | | | | |
| Vaulted Ceilings | | | | | | | |
| Dishwasher | | x | | x | | | |
| Disposal | | | | | | | x |
| Trash Compactor | | | | | | | |
| Washer/Dryer Hookup | | x | | | | | |
| Washer/Dryer In Unit | | | | | | | |
| Storage in Unit | | x | | | | | |
| Air Conditioning | x | x | x | x | x | x | x |
| Carpets/Drapes/Blinds | x | x | x | x | x | x | x |
| Walk-in Closets | | x | | | | | |
| Comparison to Subject | | Superior | Similar | Similar | Similar | Similar | Similar |
| Project Amenities | | | | | | | |
| Gated Entrance | | | | | x | | |
| Swimming Pool | | x | | | | | x |
| Spa/Hot Tub | | | | | | | |
| Sauna | | | | | | | |
| Covered Parking | | | | | | | |
| Garage/Under Building | | | | | | | |
| Tennis Court | | | | | | | |
| Playground | | x | | | x | | x |
| Clubhouse/Rec. Building | x | | | x | | x | |
| Fitness Room | | x | | | | | |
| Racquet Ball | | | | | | | |
| Volleyball | | | | | | | |
| Basketball | | | | | | | |
| Laundry Facility | x | x | x | | x | x | x |
| Storage | | | | | | | |
| Security | x | | | | | | |
| Comparison to Subject | | Superior | Inferior | Inferior | Similar | Similar | Superior |

## Value Indication

Prior to adjustment, the sales reflect a range of $40,665 to $63,469 per unit. We give greatest weight to sales 1, 3, and 6 which have the lowest adjustments, and arrive at a value indication as follows:

| Value Indication by Sales Comparison | |
|---|---|
| Indicated Value per Unit | $62,000 |
| Subject Units | 170 |
| Indicated Value | $10,540,000 |
| Rounded | $10,500,000 |

Due to the subject's location, high rise design, and high NOI per unit, a unit value near the upper end of the range is warranted.

## Income Capitalization Approach

The income capitalization approach converts anticipated economic benefits of owning real property into a value estimate through capitalization. The steps taken to apply the income capitalization approach are:

- Analyze the revenue potential of the property.
- Consider appropriate allowances for vacancy, collection loss, and operating expenses.
- Calculate net operating income by deducting vacancy, collection loss, and operating expenses from potential income.
- Apply the most appropriate capitalization method, either direct capitalization or discounted cash flow analysis, or both, to convert anticipated net income to an indication of value.

The two most common capitalization methods are direct capitalization and discounted cash flow analysis. In direct capitalization, a single year's expected income is divided by an appropriate capitalization rate to arrive at a value indication. In discounted cash flow analysis, anticipated future net income streams and a future resale value are discounted to a present value at an appropriate yield rate.

In this analysis, we use only direct capitalization because investors in this property type typically rely most on this method especially when operating at stabilized occupancy and conditions.

### Occupancy and Rental Rates

The unit mix, occupancy status, and rental rates at the subject are shown in the following tables.

**Unit Mix and Occupancy**

| Unit Type | Unit Size | Total Units | Vacant Units | Occ. Units* | % Occ. |
|---|---|---|---|---|---|
| Studio | 420 | 42 | 3 | 39 | 93% |
| 1 BR / 1 BA | 540 | 127 | 3 | 124 | 98% |
| 2 BR / 1 BA | 750 | 1 | 0 | 1 | 100% |
| TOTAL/AVG. | 512 | 170 | 6 | 164 | 96% |

*Includes employee and model units, as applicable

As of the effective valuation date, the subject is 96% leased and occupied. The property is considered to be at stabilized occupancy.

### HUD Rental Rates

The subject is a project-based Section 8 property. HUD determines the contract rent for the subject property.

**Subject Rental Rates**

| | | | Asking Rent[1] | | Contract Rent[2] | |
|---|---|---|---|---|---|---|
| Unit Type | Average Unit Size | Total Units | Average | Avg. $/SF | Average | Avg. $/SF |
| Studio | 420 | 42 | $878 | $2.09 | $878 | $2.09 |
| 1 BR / 1 BA | 540 | 127 | $948 | $1.76 | $948 | $1.76 |
| 2 BR / 1 BA | 750 | 1 | $1,000 | $1.33 | $1,000 | $1.33 |
| TOTAL/AVG. | 512 | 170 | $931 | $1.82 | $932 | $1.82 |

1. Includes employee & model units, if any.

2. Figures are for tenant-occupied units only. Excludes any employee or model units.

**Utilities Expenses**

| Tenant-Paid Utilities | Owner-Paid-Utilities |
|---|---|
| | In-Unit Electric |
| | Water |
| | Sewer |
| | Trash |
| | Gas |

### Market Rent Analysis

The subject has a project-based Section 8 Housing Assistance Program (HAP) contract. Reportedly, the contract expired June 26, 2014 but has been renewed until 2019. One hundred percent of the subject units are under the HAP contract. The 2013 contract rents were $878 for the studio, $948 for the one bedroom units, and $1,000 for the two bedroom units.

The property manager indicates there are not competing Section 8 properties in the immediate area. A search of the United States HUD website for Decatur properties only showed multifamily properties restricted to elderly or disabled tenants with the exception of one very small complex.

Since the subject's contract rents are established by HUD, only contract rents are utilized in this analysis.

## Market Rent Conclusion

Based on the preceding analysis of comparable rentals, market rent is estimated for each unit type as shown in the table that follows.

**Market Rent Conclusions**

| Unit Type | Total Units | Avg. Unit Size | Average Contract Rent | Average Asking Rent | Typical Recent Leases | Market Rent/ Month | Market Rent/SF |
|---|---|---|---|---|---|---|---|
| Studio | 42 | 420 | $878 | $878 | $878 | $878 | $2.09 |
| 1 BR / 1 BA | 127 | 540 | $948 | $948 | $948 | $948 | $1.76 |
| 2 BR / 1 BA | 1 | 750 | $1,000 | $1,000 | $1,000 | $1,000 | $1.33 |
| Total/Avg. | 170 | 512 | $932 | $931 | $931 | $931 | $1.82 |

## Stabilized Income and Expenses

### Potential Gross Rent

The following table summarizes the potential gross rent of the subject based on contract rent.

**Potential Gross Rent**

| Unit Type | Total Units | Potential Rent at Contract (1) | Avg. Contract Rent/Unit | Market Rent/Unit | Potential Rent at Market | Contract As % of Market |
|---|---|---|---|---|---|---|
| **Leased Units** | | | | | | |
| Studio | 39 | $410,904 | $878 | $878 | $410,904 | 100% |
| 1 BR / 1 BA | 124 | $1,410,624 | $948 | $948 | $1,410,624 | 100% |
| 2 BR / 1 BA | 1 | $12,000 | $1,000 | $1,000 | $12,000 | 100% |
| Total Leased | 164 | $1,833,528 | $932 | $932 | $1,833,528 | 100% |
| **Vacant Units** | | | | | | |
| Studio | 3 | $31,608 | $878 | $878 | $31,608 | 100% |
| 1 BR / 1 BA | 3 | $34,128 | $948 | $948 | $34,128 | 100% |
| Total Vacant | 6 | $65,736 | $913 | $913 | $65,736 | 100% |
| Grand Total | 170 | $1,899,264 | $931 | $931 | $1,899,264 | 100% |

[1] Contract rent for leased units; vacant and employee/model units, if any, at market.

### Employee Unit

Market rent is assigned to employee units in our income projections. Rent loss attributable to this unit is then deducted as an expense included in payroll / benefits at $12,000 annually. The employee unit is two bedrooms / one bathroom unit with HUD contract rent of $1,000 monthly.

### Expense Reimbursements

As leases do not provide for any tenant reimbursements of expenses, no expense recovery income is estimated.

**Other Income**

This category includes revenues from laundry, vending and miscellaneous sources.

**Vacancy & Collection Loss**

Stabilized vacancy and collection loss is estimated at 2.5%. This estimate considers the submarket vacancy rate and vacancy rates at competing properties.

**Concessions**

Rent concessions are not customary at the subject or typical in the market; therefore, no deductions are made.

**Expenses**

Operating expenses are estimated based on the operating history of the subject as summarized in the following table.

**Operating History and Projections**

| | Actual 2011 | Actual 2012 | Actual 2013 | IRR Projection |
|---|---|---|---|---|
| **Income** | | | | |
| Rental Income | $1,890,948 | $1,842,852 | $1,881,516 | $1,899,264 |
| Potential Gross Income* | $1,890,948 | $1,842,852 | $1,881,516 | $1,899,264 |
| Vacancy at 2.0% | -$22,290 | -$39,102 | -$32,074 | -$37,985 |
| Collection Loss at 0.5% | -2,150 | -5,604 | -10,398 | -9,496 |
| Other Income | 20,852 | 12,866 | 15,829 | 15,000 |
| Effective Gross Income | $1,887,360 | $1,811,012 | $1,854,873 | $1,866,782 |
| **Expenses** | | | | |
| Real Estate Taxes | $213,772 | $199,329 | $198,447 | $198,447 |
| Insurance | 26,217 | 29,353 | 29,889 | 29,889 |
| Utilities | 297,618 | 316,023 | 280,946 | 300,000 |
| Repairs/Maintenance | 104,757 | 136,862 | 167,186 | 145,000 |
| Painting & Decorating | 0 | 0 | 0 | 0 |
| Payroll/Benefits | 167,206 | 200,808 | 205,925 | 217,000 |
| Advertising & Marketing | 165 | 1,181 | 861 | 1,000 |
| General/Administrative | 80,199 | 40,606 | 55,966 | 60,000 |
| Management | 94,152 | 80,065 | 73,312 | 74,671 |
| Replacement Reserves | 0 | 0 | 0 | 51,000 |
| Total Expenses | $984,086 | $1,004,227 | $1,012,532 | $1,077,007 |
| **Net Operating Income** | **$903,274** | **$806,785** | **$842,341** | **$789,775** |
| Operating Expense Ratio | 52.1% | 55.5% | 54.6% | 57.7% |
| | | | | |
| **Income per Unit** | | | | |
| Rental Income | $11,123 | $10,840 | $11,068 | $11,172 |
| Potential Gross Income per Unit | $11,123 | $10,840 | $11,068 | $11,172 |
| Vacancy at 2.0% | -$131 | -$230 | -$189 | -$223 |
| Collection Loss at 0.5% | -13 | -33 | -61 | -56 |
| Concessions at 0.0% | | | | 0 |
| Other Income | 123 | 76 | 93 | 88 |
| Effective Gross Income per Unit | $11,102 | $10,653 | $10,911 | $10,981 |
| | | | | |
| **Expenses per Unit** | | | | |
| Real Estate Taxes | $1,257 | $1,173 | $1,167 | $1,167 |
| Insurance | 154 | 173 | 176 | 176 |
| Utilities | 1,751 | 1,859 | 1,653 | 1,765 |
| Repairs/Maintenance | 616 | 805 | 983 | 853 |
| Painting & Decorating | 0 | 0 | 0 | 0 |
| Payroll/Benefits | 984 | 1,181 | 1,211 | 1,276 |
| Advertising & Marketing | 1 | 7 | 5 | 6 |
| General/Administrative | 472 | 239 | 329 | 353 |
| Management | 554 | 471 | 431 | 439 |
| Replacement Reserves | 0 | 0 | 0 | 300 |
| Total Expenses per Unit | $5,789 | $5,907 | $5,956 | $6,335 |
| NOI per Unit | **$5,313** | **$4,746** | **$4,955** | **$4,646** |
| Number of Units | 170 | 170 | 170 | 170 |

*IRR projected income is the total potential income attributable to the property before deduction of vacancy and collection loss. Historical income is the actual income that has been collected by the property owner.

## Capitalization Rate Selection

A capitalization rate is used to convert net income into an indication of value. Selection of an appropriate capitalization rate considers the future income pattern of the property and investment risk associated with ownership. We consider the following data in selecting a capitalization rate for the subject.

**Capitalization Rate Comparables**

| No. | Property Name | Year Built | Sale Date | % Occup. | No. Units | Price/ Unit | Cap Rate |
|---|---|---|---|---|---|---|---|
| 1 | Meridian Pointe | 1991 | 10/11/2013 | 95% | 164 | $63,110 | 6.03% |
| 2 | Oakwood Villa Apartments | 1972 | 4/11/2013 | 93% | 200 | $43,250 | 8.10% |
| 3 | Mill Pond Apartments | 1983 | 12/28/2012 | 100% | 49 | $63,469 | – |
| 4 | 135th St. Apartments | 1968 | 11/6/2012 | 95% | 65 | $40,665 | 9.70% |
| 5 | Taylor Apartments | 1970 | 8/15/2012 | 95% | 101 | $42,416 | 6.81% |
| 6 | Perrywood Garden Apartments | 1972 | 2/29/2012 | 97% | 184 | $54,348 | 9.87% |
| | Average (Mean) Cap Rate: | | | | | | 8.10% |

The capitalization rates range from 6.03% to 9.87%. Due to the subject's location and high rise design a capitalization rate near the lower end of the range is warranted. This is offset somewhat by the subject's project-based Section 8 status. Many investors are unwilling to purchase such properties or require slightly higher capitalization rates above a similar property without income restrictions or government subsidies.

**Capitalization Rate Surveys – Multifamily Properties**

| | IRR-Viewpoint Year End 2013 National Urban Multifamily | IRR-Viewpoint Year End 2013 National Suburban Multifamily | PwC 4Q-2013 National Apartment | ACLI 3Q-2013 National Apartment |
|---|---|---|---|---|
| Range | 4.0% - 8.50% | 4.0% - 7.75% | 3.50% - 10.00% | NA |
| Average | 5.76% | 5.87% | 5.80% | 5.81% |

Source: IRR-Viewpoint 2014; PwC Real Estate Investor Survey; American Council of Life Insurers Investment Bulletin.

## Multifamily Capitalization Rate Trends




| | 1Q-12 | 2Q-12 | 3Q-12 | 4Q-12 | 1Q-13 | 2Q-13 | 3Q-13 | 4Q-13 |
|---|---|---|---|---|---|---|---|---|
| PwC | 5.83 | 5.76 | 5.74 | 5.72 | 5.73 | 5.70 | 5.61 | 5.8 |
| ACLI | 6.39 | 6.02 | 6.36 | 5.80 | 6.14 | 5.77 | 5.81 | |

PwC- PwC Real Estate Investor Survey - National Apartment Market
ACLI - American Council of Life Insurers Investment Bulletin - Apartment Properties

| Band of Investment Method | | | | |
|---|---|---|---|---|
| **Mortgage/Equity Assumptions** | | | | |
| Loan To Value Ratio | 75% | | | |
| Interest Rate | 4.00% | | | |
| Amortization (Years) | 25 | | | |
| Mortgage Constant | 0.0633 | | | |
| Equity Ratio | 25% | | | |
| Equity Dividend Rate | 8.00% | | | |
| **Weighted Average of Mortgage and Equity Requirements** | | | | |
| Mortgage Requirement | 75% | x | 6.33% = | 4.75% |
| Equity Requirement | 25% | x | 8.00% = | 2.00% |
| **Indicated Capitalization Rate** | | | | **6.75%** |
| **Rounded** | | | | **6.75%** |

Based on an analysis of the preceding data, a going-in capitalization rate for the subject is indicated within a range of 6.03% to 9.87%. To reach a capitalization rate conclusion, we consider each of the following investment risk factors to gauge its impact on the rate. The direction of each arrow in the following table indicates our judgment of an upward, downward, or neutral influence of each factor.

| Risk Factor | Issues | Impact on Rate |
|---|---|---|
| Income Characteristics | Stability of occupancy, above/below market rents, rent control. | ↓ |
| Competitive Market Position | Construction quality, appeal, condition, effective age, functional utility. | ↔ |
| Location | Market area demographics and life cycle trends; proximity issues; access and support services. | ↓ |
| Market | Vacancy rates and trends; rental rate trends; supply and demand. | ↓ |
| Highest & Best Use | Upside potential from redevelopment, adaptation, expansion. | ↔ |
| Overall Impact | | ↓ |

As stated previously, the subject's location and high rise design warrants a low capitalization rate offset somewhat the subject's project-based Section 8 status. Accordingly, we conclude a capitalization rate as follows:

| Capitalization Rate Conclusion | |
|---|---|
| Going-In Capitalization Rate | 7.00% |

## Direct Capitalization Analysis

Net operating income is divided by the capitalization rate to indicate the stabilized value of the subject. Valuation of the subject by direct capitalization is shown in the table that follows.

**Direct Capitalization Analysis**

| | Annual | $/Unit |
|---|---|---|
| INCOME | | |
| Rental Income | $1,899,264 | $11,172 |
| Potential Gross Income | $1,899,264 | $11,172 |
| Effective Gross Income | $1,866,782 | $10,981 |
| EXPENSES | | |
| Total Expenses | $1,077,007 | $6,335 |
| NET OPERATING INCOME | $789,775 | $4,646 |
| Capitalization Rate | 7.00% | |
| **Indicated Value** | $11,282,501 | $66,368 |
| **Rounded** | **$11,300,000** | **$66,471** |

## Reconciliation and Conclusion of Value

The values indicated by our analyses are as follows:

**Summary of Value Indications**

| | Market Value |
|---|---|
| Cost Approach | Not Used |
| Sales Comparison Approach | $10,500,000 |
| Income Capitalization Approach | $11,300,000 |
| Reconciled | $11,000,000 |

The income capitalization approach is given the greatest weight because it is the most reliable valuation method for the subject. The sales comparison approach is given less weight because it does not directly consider the income characteristics of the property. The cost approach is not applicable to the subject and is not used. Accordingly, our value opinion follows.

**Value Conclusions**

| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
|---|---|---|---|
| Market Value | Leased Fee | November 1, 2013 | $11,000,000 |
| Estimated Market Resistance (Stigma) of 30% | Leased Fee | November 1, 2013 | $3,300,000 |

**Extraordinary Assumptions and Hypothetical Conditions**

The value conclusions are subject to the following extraordinary assumptions that may affect the assignment results. An extraordinary assumption is uncertain information accepted as fact. If the assumption is found to be false as of the effective date of the appraisal, we reserve the right to modify our value conclusions.

1. That the effective date of the appraisal, November 1, 2013, is prior to the differential soil settlement of the subject improvements.
2. That the property does not suffer from significant deferred maintenance based on the May 2, 2013 Drucker & Falk, LLC Maintenance Inspection.

The value conclusions are based on the following hypothetical conditions that may affect the assignment results. A hypothetical condition is a condition contrary to known fact on the effective date of the appraisal but is supposed for the purpose of analysis.

1. The market resistance (stigma) percentage estimate is applied to the value before the differential soil settlement but assumes the necessary repairs will be completed. Since the repairs had not be completed as of 11/1/2013, this is considered a Hypothetical Condition.

The opinions of value expressed in this report are based on estimates and forecasts that are prospective in nature and subject to considerable risk and uncertainty. Events may occur that could cause the performance of the property to differ materially from our estimates, such as changes in the economy, interest rates, capitalization rates, financial strength of tenants, and behavior of investors, lenders, and consumers. Additionally, our opinions and forecasts are based partly on data obtained from interviews and third party sources, which are not always completely reliable. Although we are of

the opinion that our findings are reasonable based on available evidence, we are not responsible for the effects of future occurrences that cannot be reasonably foreseen at this time.

### Exposure and Marketing Times

Our estimates of exposure and marketing times are as follows:

| Exposure Time and Marketing Period | |
|---|---|
| Exposure Time (Months) | 9 |
| Marketing Period (Months) | 9 |

## Market Resistance (Stigma)

Reportedly in late 2013, the subject improvements began settling. This resulted in the east end of the subject improvements sinking three-plus inches and extensive structural damage throughout portions the improvement.

We were provided a preliminary report prepared by Solis Parker & Associates, Inc. Below is excerpts from the report.

> As requested by IPG; Solis Parker & Associates traveled to the referenced site in Decatur, GA on March 4, 2014. We visually inspected the building for damage and observed cracks in numerous walls, floors and ceilings. We requested any available documents for evaluations and the manager provided original hard copies of the site drawings, we also took photos of pertinent documents.




**Photo #1**- Building overhead view. Note crack location planes.




**Photo #4** – 4th floor west of center stairwell




**Photo #5** – 4th floor east of center stairwell




**Photo #6** – 8th floor stairwell, 1" out of plane crack.




**Photo #7** – 4th Fl. Hall wall stucco spall.




**Photo #8** – South face west of stairwell, line **8**.




**Photo #9** – South face west of stairwell




**Photo #10** – North face along east of stairwell.



**Photo #11** – Ongoing construction south of property.

Observations from the report are:

- During our visual inspection to the complex we observed the most significant wall cracks located in the center of the building. There were cracks just to the west (Units 812, 612, 412) and east (Unit601) of the elevator/stairwell. (See photos **#2-5**) The cracks taper from 3/4" on the 8th floor to hairline cracks on the 1st floor. These cracks extend across the entire width of the building from the north face to the south face.
- Inside the center stairwell we observed cracks and separations in the block wall. At the 8th floor the wall had recessed back 1". (See photo **#5**) We field measured the block wall width of the center stairwell to be 8'0 at the first floor. We sample measured the block wall width to be 8'2 at the 8th floor. A 2" difference between 1st and 8th floors.

- We observed new 1/8" cracks in the west stairwell also. We observed no new cracking in the east stairwell.
- There is some spalling in stucco located in the west hallway of the 4th floor (See photo **#7**).This could be from movement in the block behind the stucco, or a poor installation of the stucco and not related to the building deformation since we only noted one location with this type of spalling.
- From the roof we observed the worst exterior cracks to be west of the center stairwell along the south face (See photo **#8-9**)
- We reviewed the site plans provided and noted an 8" cast iron pipe (CIP) drain that flows underneath the building on drawing SP-3. This drain is located on the south side near the loading dock. The pipe is located just west of the center stairwell/elevator and runs north to the front of the building near the main entrance. (See photo **#12**)
- There is an ongoing construction project north of this property. (See photo **#11**)

The April 11, 2014 report from Solis Parker & Associates, Inc. shows survey results below:




**1 – Survey Results of 1st & 8th Floors. H=10'0/span; V=inch**

The April 18, 2014 report from Solis Parker & Associates, Inc. was reviewed. Following are excerpts from the report:




**Photo #3- Estimated Original Water table and Dewatering Level Change. Note drop at well point**

Support Evidence:

1. It is out opinion, that there is evidence that the building is undergoing settlement and that the cracking in the building is due to differential settlement between the west half and the east half with a slight tilt north. Since the building is 30 years old, this movement is not expected and a new event needs to be identified as the cause to the renew settlement movement.

2. The de-watering operations and the crack propagation are approximately taking place at the same time period for a building that had been in service for 30 years and should had reached its soils support equilibrium long ago.

3. Crack propagations indicate a settlement of the eastern half of the building, the west half seems not affected which would correlate as the water draw down point is further removed from the building west half. A survey for the building is pending to confirm a change in level along the building.

4. Soils under the building are anticipated to be compressible and would naturally compress/shrink if the water is removed creating a settlement under the affected portions of the building, primarily the eastern half due to proximity to the dewatering operations. A soil study is underway to validate the concept.

We also reviewed the Beech Consulting, Inc. report from July 21, 2014. This is an excerpt from the report:

For reference purposes the building is approximately 245-feet long in the west-to-east direction. GES's early May 2014 elevations survey indicates that the building's finished first floor elevation ranges from about 1,016.92 feet at its west end to 1,016.64 feet at its east end.

- GES's survey indicates that the building floor slab is abnormally sloped downward from west-to-east. The eastern end of the first floor slab surface is about 3.36-inches lower in elevation than at the western end of the first floor. About 80-feet east of the western end of the building, the floor elevation is about 0.24-inch lower than at the building's western end. Additionally, about 90-feet from the western end of the building, the floor elevation is about 0.48-inch lower than at the building's western end (this location corresponds closely with column line #9, when viewing the building's structural drawings). Based on the above, starting at about 80-feet from the western end of the building, the rate of floor slab sloping/settlement becomes significantly increased. Based on the above, the elevation differential between column line # 9 and the eastern end of the building (column line #1) is about 2.88-inches and occurs over a span of about 155-feet. The above elevations survey analysis indicates that the eastern end of the building has settled significantly.

Based on our review of survey data by Mr. Solis' surveyor during his team's concurrent investigation of the building, the elevation at the eastern end of the 1st floor was about 1/8-inch higher on about April 12, 2014 than when GES topographically surveyed the same location on about May 8, 2014. This difference in elevation indicates that the eastern end of the building settled downward approximately 1/8-inch during the time period between April 12 and May 8, 2014.

- As discussed above, based on GES's evaluation/analysis of the soils to date, we believe the building's foundation piles extend approximately 65-feet below the first story floor level.

- GES's geotechnical investigations on site, conducted May 7 - May 12, 2014, suggest that the foundation piles below the western portion of the building are bearing onto bedrock/very dense soils, where auger-refusal was encountered less than 65-feet below the building's floor elevation. However, below the eastern portion of the building, auger-refusal was encountered at elevations that were deeper than 65-feet below the building's floor elevation. In short, based on analyses to date, the foundation piles below the western portion of the building are performing as end-bearing piles, while the foundation piles below the eastern portion of the building are performing as friction piles. GES's field investigations also indicate that the ground-water elevation at the eastern end of the building (at Boring #s 1 & 2; about elevation 983') was about 7-feet lower than at the western end of the building (at Boring #s 4 & 5; about elevation 990'). This lower ground water elevation is very possibly related to dewatering activities recently being conducted at the construction site at the eastern boundary of the Park Trace Apartments property. Significant changes in ground water elevation can adversely affect soils bearing capacity of friction piles.

***Conclusions Summary and Documents Needed for Further Study***

Based on the above, we believe that the abnormal settlement of the eastern portion of the building and the patterns of the reported new cracking throughout the building are related to the recent, nearby dewatering activity. This conclusion is supported by the current visible walls/floors crack conditions that are in contrast with the observations within the Gill Group's November 2010 report, which reported no cracking. This conclusion is also supported by the significant differential of ground-water elevations between the eastern and western ends of the building, with the lower ground water elevations occurring closest to the nearby dewatering activity at the adjacent construction site.

**Engineer Interviews**

We spoke with the following engineers:

**John H. Stewart, P.E.**
National Design Group Manager
Rimkus Consulting Group, Inc.

On July 27, 2015, Mr. Stewart indicated he cannot guarantee there will not be future movements of the building. Once settling has occurred, there is more risk for future settling of the building than a building without settling. There are no absolute guarantees with the repairs of the Park Trace Apartments.

**Emilio J. Solis, P.E.**
Solis & Parker Associates, Inc.

**Randy Sullivan, P.E.**
**Daren J. Zywicki, PhD, P.E.**
Golder Associates

On July 31, 2015 we interviewed Mr. Solis, Mr. Sullivan, and Mr. Zywicki. They indicated there is no guarantee that additional repairs to Park Trace Apartments would not be required in the future. Mr. Solis indicated that there are two components: soil issues and structural/repair issues. He indicated the repairs are adequate and correct and may be sufficient for minor soil settlement in the future. However, he also stated there is no guarantee regarding the repairs.

### Structural Repair Costs

The repair cost of the structural damage to the subject property is $2,562,782.85. The Belfor itemized cost estimated is presented below. Reportedly, the full amount of $2,562,7682.85 has been billed to the property owner.

**50803707 Belfor Cost Estimate Summary**

| | Base Bid | Base+CO1 | Base+CO1+CO2 |
|---|---|---|---|
| Date | 10/24/14 | 12/30/14 | 7/3/15 |
| Basis | Prelim Sketches & Notes Rev. C May 22, 2014 | Permit Dwgs Rev 1 dated August 29, 2014 | Rev 2 Dwgs dated April 15, 2015 + Temp Items + Misc |
| **Prep Items** | | | |
| Dust Control | $2,820.00 | $2,820.00 | $2,820.00 |
| Zippers | $809.60 | $809.60 | $809.60 |
| Scrubbers | $21,462.00 | $21,462.00 | $21,462.00 |
| Ducting | $174.00 | $174.00 | $174.00 |
| Hepa Filters | $4,459.44 | $4,459.44 | $4,459.44 |
| HVAC | $37,500.00 | $78,000.00 | $78,000.00 |
| Electrical | $60,000.00 | $86,000.00 | $86,000.00 |
| Plumbing | | $8,500.00 | $8,500.00 |
| Temporary Shoring (Line 6) | $49,130.00 | $49,130.00 | $49,130.00 |
| Temporary Shoring (#2 Stair) | | $12,500.00 + | $12,500.00 |
| | $176,355.04 | $263,855.04 | $263,855.04 |
| **Rough Items** | | | |
| Grout CMU Material | $36,000.00 | $68,500.00 | $68,500.00 |
| Grout CMU Labor | $162,000.00 | $196,000.00 | $196,000.00 |
| Steel Material | $98,500.00 | $98,500.00 | $98,500.00 |
| Steel Fab Labor | $48,500.00 | $48,500.00 | $48,500.00 |
| Steel Installation Labor | $186,000.00 | $208,000.00 | $208,000.00 |
| Additional rebar cutting | | | OPEN + |
| Bearing pads | | | $22,500.00 + |
| Stair #2 door relocation | | $96,450.00 | $96,450.00 |
| Exit door maintenance | | | $1,696.00 |
| Expansion Joint (L&M) | $148,500.00 | $148,500.00 | $148,500.00 |
| Slab Demolition (Col 8) | $48,000.00 | $52,500.00 | $52,500.00 |
| Roofing | $18,000.00 | $18,000.00 | $18,000.00 |
| | $745,500.00 | $934,950.00 | $959,146.00 |
| **Walls and Ceiling** | | | |
| Stud Wall (R&R) | $35,200.00 | $54,400.00 | $54,400.00 |
| Drywall (Install for paint) | $22,500.00 | $82,500.00 | $82,500.00 |
| | $57,700.00 | $136,900.00 | $136,900.00 |
| **Finishes and Hardware** | | | |
| Paint | $48,500.00 | $48,500.00 | $48,500.00 |
| Fireproof Paint | | $11,500.00 | $11,500.00 |
| Cementitious Fire Coating | | $9,500.00 | $9,500.00 |
| | $48,500.00 | $69,500.00 | $69,500.00 |

| | Base Bid | Base+CO1 | Base+CO1+CO2 |
|---|---|---|---|
| Date | 10/24/14 | 12/30/14 | 7/2/15 |
| Basis | Prelim Sketches & Notes Rev. C May 22, 2014 | Permit Dwgs Rev 1 dated August 29, 2014 | Rev 2 Dwgs dated April 15, 2015 + Temp Items + Misc |
| **Floors & Cleaning** | | | |
| Glue Down Carpet (R&R) | $48,400.00 | $48,400.00 | $48,400.00 |
| Final Cleaning | $7,680.00 | $7,680.00 | $7,680.00 |
| | $56,080.00 | $56,080.00 | $56,080.00 |
| **General** | | | |
| Temporary Toilet | $1,338.00 | $1,338.00 | $0.00 |
| Office | $1,674.48 | $1,674.48 | $0.00 - |
| Power (R&R) | $496.50 | $496.50 | $0.00 - |
| Power usage | $672.24 | $672.24 | $0.00 - |
| Storage Container | $1,605.60 | $1,605.60 | $1,605.60 |
| Container Delivery | $672.00 | $672.00 | $672.00 |
| General Demolition | | $34,500.00 + | $34,500.00 |
| Dumpster | $3,300.00 | $3,300.00 | $3,300.00 |
| Supervision | $62,887.00 | $54,883.20 | $62,887.00 + |
| Ass't Project Manager | | $33,600.00 | $0.00 - |
| General Conditions | $10,000.00 | $10,000.00 | $10,000.00 |
| Permits | | $5,950.00 | $5,950.00 |
| Fire Protection System | | $16,452.11 | $16,452.11 |
| | $82,645.82 | $165,144.13 | $135,366.71 |
| | Change Order #2 Subtotal | | $ 518,829.35 |
| SUBTOTAL | $1,166,780.86 | $1,626,429.17 | $2,139,677.10 |
| TAX | $23,729.55 | $31,332.24 | $32,338.55 |
| | $1,190,510.41 | $1,657,761.41 | $2,172,015.65 |
| OH | $119,051.04 | $165,776.14 | $205,405.26 |
| PROFIT | $119,051.04 | $165,776.14 | $185,361.94 |
| | $1,428,612.49 | $1,989,313.69 | $2,562,782.85 |

To determine if there is market resistance (stigma) to the subject property due to the settling of the improvements, we conducted market participant interviews, completed literature reviews, and considered the engineer's opinion regarding future settling. We also reviewed excerpts of the *Royal Capital Development, LLC v. Maryland Casualty Company Supreme Court of Georgia Case No. S12Q0209* regarding structural damages to the Capital Building from adjacent construction. We attempted to speak with David Davoudpour, President and CEO of Royal Capital Corp. regarding the Capital Building but to no avail. The current property manager was unaware of the lawsuit or damages to the building that occurred several years before she became the property manager of the Capital Building.

*The Royal Capital Development, LLC v. Maryland Casualty Company Supreme Court of Georgia Case No. S12Q0209* indicates diminution in value: Is a residual reduction in value resulting from stigma due to the building's past physical damage, even after all repairs have been made. Recognition of diminution in value as an element of loss merely reflects economic reality. The measure of damages in cases involving damages to real property is intended to place an injured party, as nearly as possible, in the same position it would have been if the injury had never occurred.

## Market Participant Interviews

***Investors:***

*Robert Clark, RADCO, 6/8/2015*

RADCO purchases multifamily properties in the Atlanta area. Many of the properties are value add and RADCO renovates the properties. Mr. Clark indicates they would require an engineer report for the subject property. If the report revealed the 2013 occurrence was a "one time event", then a discount in the property value would not be applicable. However, if the engineer report could not provide an assurance that the occurrence would not take place again they would consider this risk in the ***capitalization rate and additional reserves. He indicated the likely increase in the cap rate would be 100 basis points but would not opine to how much of an increase in reserves would be applicable. The combination of the higher reserves and cap rate would reflect a "sizeable discount" to the purchase*** price. Mr. Clark indicates the current cap rate for a 1980s vintage multifamily development in Decatur would approximate 5.75%.

***Gideon Levy, SABRA Property Management, 6/8/2015***

Mr. Levy purchases multifamily properties throughout the Atlanta area. He typically buys value add properties which he then renovates and charges rental premiums. He is well known for minimizing operating expenses at properties he owns. ***Mr. Levy indicates he would not purchase the subject property because the risk in the future of another occurrence is unknown.*** Potentially, if the property has not settled in 10 years he would consider a purchase of the property. The fact that the subject in one building versus multiple structures intensifies the risk as well as the potential for elevator shaft issues since the structure required substantial repairs of the units adjacent to the elevator shaft.

***Brokers***

*David Guttin, Jones Lang LaSalle, 6/11/2015*

Mr. Guttin indicates if he was marketing the property he would request an "all clear letter" from an engineer. A buyer would require intensive forensic studies. If an "all clear letter" was not attainable a discount would be required. He indicates they would attempt to quantify the probability of another occurrence in the future. **Thus, if the engineer felt there was a 50% likelihood of another occurrence in the future they would require the seller to have $1,500,000 in reserves set aside for future events.** He considered this a capital expenditure issue instead of a capitalization issue. He indicated the cap rate for a HUD property would be 6.0 – 6.5% in 2013. If the HUD contract was expiring the cap rate would have been 5.5%. A likely purchase prior to the occurrence would renovate the units and charge rents above $2.00 per SF, monthly if the HUD contract were not in existence.

*Judy MacManus, MAI, Brown Realty*

Ms. MacManus indicates she has not dealt with this precise situation before with unknown future risk. She indicates in the past there was a listing and during the due diligence it was determined all the buildings had a missing joist which was causing settling. The buildings required "jacking up the structure and adding another joist" to correct the structural deficiency. It this situation, the repair was anticipated to be a permanent solution. The buyer required the seller to reduce the sale price by the cost of the repairs but the seller refused. She indicates with groundwater contamination properties are typically not marketable until the contamination is removed. However, she indicates neither of these scenarios is similar to the subject. **She would anticipate once the repairs are completed, an increase in the cap rate of approximately 50 to 100 basis points would be required and much higher reserves than a property without this issue.**

Confidential real estate broker at a national firm

This is a well-known multifamily real estate broker. He indicates at least 50% of the lenders will not finance a loan on the subject property due to the structural issues. He also indicates at least 50% of the investors will not purchase the subject property due to the occurrence and high costs of the structural repairs. **He opinioned that most investors would require a lengthy due diligence period with extensive engineer studies and depending upon the outcome of the engineers' report would likely require a significant discount for potential future repairs as well as an additional discount for management and headache of potential future repairs. There is also the possibility of relocating tenants if future repairs are needed.**

***Lenders***

*Jean Moss, MAI, Wells Fargo RETECHS, 6/8/2015*

Ms. Moss indicates an engineer's report would be required as to their opinion of the stability of the structure as repaired and the potential for future settling. **If this report did not indicate there was minimal potential for future structural issues it is probable Wells Fargo would not loan on this property.** If HUD would insure the property, then there is the potential for a HUD loan through Wells Fargo.

*Lisa Jenkins Wells, Renasant Bank, 5/28/2015*
Ms. Wells indicates that once the structure is repaired, **to secure a loan they would likely require special reserves, a performance bond in case of potential issues of perhaps $1,500,000, would consider a lower loan-to-value ratio depending on the amount of the performance bonds and reserves.**

**Survey of Real Estate Appraisers**
We asked other real estate appraisers including Integra Realty Resources and The Real Estate Counseling Group, for information regarding properties they had appraised with structural issues and their opinion if there is a diminution of value or stigma associated with these properties. The general consensus is there is a stigma to the property which negatively impacts the property value. Factors include reduced financing options, rental loss, repair costs, additional fees to monitor future repairs, legal fees, longer marketing times, substantially higher insurance premiums, and higher capitalization rates. **One appraiser opined that the cap rate would increase approximatley 50 – 100 basis points. Another appraiser's opinion is if the structural repair costs exceed $1,000,000, the stigma is substantial.** Lastly, another appraiser appraised a multistory property with settlement issues. The basement had settled and was uninhabitable. **When a fire destroyed the building the city would not grant a building permit.**

**Literature Review**
Numerous articles and publications were reviewed regarding real estate damages. The bulk of the information available is regarding contamination issues and involving residential properties.

**When bad things happen to good property, Robert A. Simons, Ph.D.**
The author primarily discusses the loss in value to properties with contamination issues. He references lenders hesitancy to loan on properties with higher risks. Typically, the loan-to-value ratio declines so the borrower is required to have more equity. He also indicates property owners have higher default rates with contaminated properties. In general, he indicates Leaking Underground Storage Tanks contaminated properties sell at prices 11% – 31% below similar properties without contamination. Dr. Simons indicates there are five types of realized capital loss: "(1) a sale below market price where the difference between market value and actual sales price is attributed to the contamination; (2) a delayed sale (including a failed transaction that may have been delayed for years); (3) a property that could not be financed that is sold below market price; (4) seller financing; and (5) loan default.

**Real Estate Damages, by Randall Bell, MAI, 2008.**
There is a case study in this book: Hollywood Boulevard, Sinkhole and Subsidence Case Study by Orell C. Anderson, MAI. The Case Study reflects property damage from the Los Angeles Metropolitan Transit Authority construction of the Red Line in 1983. The first phase was complete January 30, 1993 and second phase completed on July 13, 1996. During construction of the tunnels below Hollywood Boulevard there was significant damage in the 6500 block of Hollywood Boulevard. Reportedly, significant damage occurred at an apartment building and a three story retail/office building. On June 22, 1995, an 80 foot sinkhole appeared at the 6300 block of Hollywood Boulevard. There were also cracks in the tunnel near the sinkhole. The apartment and office buildings required structural repairs. The Case Study indicates although the area was impacted by economic recession which impacted property values there was diminution of value due to the structural issues. Rents after the tunnel repairs declined from $1.50 to $2.50 per square foot, net in retail properties to $.50 to $1.25 per square foot in 1997. Second-story office space declined from $1.00 per square foot to $.50 per square foot. **Thus, the Case Study indicates a rental decline of 50% to 67%. Property values declined for retail properties from $175 to $200 per square foot in 1992 to $125 in 1997, or a 29% to 38% decline. Land values declined approximately 50%. As stated previously, the amount of the decline was attributable to the economic recession and the tunnel.**

There is an additional case study: Beverly Hills Estate Case Study by Randall Bell, MAI. The Case Study involves a residential house in Beverly Hills, California with 6,544 square foot residence. The property had building construction defects and water damage. The Case Study presents 17 residential sales that have various detrimental conditions reflecting 4% to 33% discounts in property values with most falling in the 15% to 25% range.

Lastly, there is a Krantz House Case Study by Joseph Haeussler, MAI, with subsurface construction condition. Based on residential sales with and without soil issues, **the Case Study indicates a 20% discount.**

**Findings:**
The surveys indicate diminutions of value due to the following factors:

- Risk of future structural damage
- 50 – 100 basis points higher capitalization rates
- Higher reserves
- Performance bond or escrow for future capital expenditures
- Constrained financing options in the future and during the structural repair phase which has precluded refinancing of the subject property at the current low interest rates. Many lenders would refuse to provide financing to the subject property or require lower loan-to-values, higher interest rates, and lower amortization periods.
- Reduced pool of potential investors
- Extended marketing period
- Higher insurance premiums
- Case studies indicate typically 15% to 25% decline in property value

**Conclusion:**

Based on the market participant interviews and literature reviews a diminution of value discount of 15% to 25% is suggested. This may not totally reflect the anticipated financing hurdles since lower end commercial or residential properties may have been cash purchases. This does not reflect reserves, escrows or performance bonds. Considering all these factors, a higher discount above 15% to 25% is warranted. A diminution of value in the range of 20% to 35%, due to stigma or market resistance is reasonable.*

*Note – our analysis above only pertains to loss in value due to Stigma/Market Resistance. It does not include actual costs to correct damages, rent losses, etc. during and after the correction process, or increases in expenses after the correction, such as insurance.

**We conclude a diminution of value of 30% for the subject property which results in diminution of market value of $3,300,000, when applied to the November 1, 2013 market value conclusion of $11,000,000.**

## Extraordinary Assumptions and Hypothetical Conditions

The value conclusions are subject to the following extraordinary assumptions that may affect the assignment results. An extraordinary assumption is uncertain information accepted as fact. If the assumption is found to be false as of the effective date of the appraisal, we reserve the right to modify our value conclusions.

1. That the effective date of the appraisal, November 1, 2013, is prior to the differential soil settlement of the subject improvements.
2. That the property does not suffer from significant deferred maintenance based on the May 2, 2013 Drucker & Falk, LLC Maintenance Inspection.

The value conclusions are based on the following hypothetical conditions that may affect the assignment results. A hypothetical condition is a condition contrary to known fact on the effective date of the appraisal but is supposed for the purpose of analysis.

1. The market resistance (stigma) percentage estimate is applied to the value before the differential soil settlement but assumes the necessary repairs will be completed. Since the repairs had not be completed as of 11/1/2013, this is considered a Hypothetical Condition.

# Certification

We certify that, to the best of our knowledge and belief:

1. The statements of fact contained in this report are true and correct.
2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.
3. We have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.
4. We have not performed any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.
5. We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.
6. Our engagement in this assignment was not contingent upon developing or reporting predetermined results.
7. Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
8. Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice as well as applicable state appraisal regulations.
9. The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.
10. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.
11. We certify that to the best of our knowledge and belief, our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Georgia Real Estate Appraiser Classification and Regulation Act and the Rules and Regulations of the Georgia Real Estate Appraisers Board.
12. Sherry L. Watkins, MAI, FRICS, ASA, made a personal inspection of the property that is the subject of this report. J. Carl Schultz, Jr., MAI, CRE, SRA, CRE, FRICS, has personally inspected the subject.
13. No one provided significant real property appraisal assistance to the person(s) signing this certification.

14. We have experience in appraising properties similar to the subject and are in compliance with the Competency Rule of USPAP.

15. As of the date of this report, Sherry L. Watkins, MAI, FRICS, ASA and J. Carl Schultz, Jr., MAI, CRE, SRA, CRE, FRICS have completed the continuing education program for Designated Members of the Appraisal Institute.

Sherry L. Watkins, MAI, FRICS, ASA
Senior Managing Director
Certified General Real Estate Appraiser
GA Certificate # CG1536

J. Carl Schultz, Jr., MAI, CRE, SRA, CRE, FRICS
Director
Certified General Real Estate Appraiser
GA Certificate # CG818

# Assumptions and Limiting Conditions

This appraisal and any other work product related to this engagement are limited by the following standard assumptions, except as otherwise noted in the report:

1. The title is marketable and free and clear of all liens, encumbrances, encroachments, easements and restrictions. The property is under responsible ownership and competent management and is available for its highest and best use.
2. There are no existing judgments or pending or threatened litigation that could affect the value of the property.
3. There are no hidden or undisclosed conditions of the land or of the improvements that would render the property more or less valuable. Furthermore, there is no asbestos in the property.
4. The revenue stamps placed on any deed referenced herein to indicate the sale price are in correct relation to the actual dollar amount of the transaction.
5. The property is in compliance with all applicable building, environmental, zoning, and other federal, state and local laws, regulations and codes.
6. The information furnished by others is believed to be reliable, but no warranty is given for its accuracy.

This appraisal and any other work product related to this engagement are subject to the following limiting conditions, except as otherwise noted in the report:

1. An appraisal is inherently subjective and represents our opinion as to the value of the property appraised.
2. The conclusions stated in our appraisal apply only as of the effective date of the appraisal, and no representation is made as to the effect of subsequent events.
3. No changes in any federal, state or local laws, regulations or codes (including, without limitation, the Internal Revenue Code) are anticipated.
4. No environmental impact studies were either requested or made in conjunction with this appraisal, and we reserve the right to revise or rescind any of the value opinions based upon any subsequent environmental impact studies. If any environmental impact statement is required by law, the appraisal assumes that such statement will be favorable and will be approved by the appropriate regulatory bodies.
5. Unless otherwise agreed to in writing, we are not required to give testimony, respond to any subpoena or attend any court, governmental or other hearing with reference to the property without compensation relative to such additional employment.
6. We have made no survey of the property and assume no responsibility in connection with such matters. Any sketch or survey of the property included in this report is for illustrative purposes only and should not be considered to be scaled accurately for size. The appraisal

covers the property as described in this report, and the areas and dimensions set forth are assumed to be correct.

7. No opinion is expressed as to the value of subsurface oil, gas or mineral rights, if any, and we have assumed that the property is not subject to surface entry for the exploration or removal of such materials, unless otherwise noted in our appraisal.

8. We accept no responsibility for considerations requiring expertise in other fields. Such considerations include, but are not limited to, legal descriptions and other legal matters such as legal title, geologic considerations such as soils and seismic stability; and civil, mechanical, electrical, structural and other engineering and environmental matters. Such considerations may also include determinations of compliance with zoning and other federal, state, and local laws, regulations and codes.

9. The distribution of the total valuation in the report between land and improvements applies only under the reported highest and best use of the property. The allocations of value for land and improvements must not be used in conjunction with any other appraisal and are invalid if so used. The appraisal report shall be considered only in its entirety. No part of the appraisal report shall be utilized separately or out of context.

10. Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraisers, or any reference to the Appraisal Institute) shall be disseminated through advertising media, public relations media, news media or any other means of communication (including without limitation prospectuses, private offering memoranda and other offering material provided to prospective investors) without the prior written consent of the persons signing the report.

11. Information, estimates and opinions contained in the report and obtained from third-party sources are assumed to be reliable and have not been independently verified.

12. Any income and expense estimates contained in the appraisal report are used only for the purpose of estimating value and do not constitute predictions of future operating results.

13. If the property is subject to one or more leases, any estimate of residual value contained in the appraisal may be particularly affected by significant changes in the condition of the economy, of the real estate industry, or of the appraised property at the time these leases expire or otherwise terminate.

14. Unless otherwise stated in the report, no consideration has been given to personal property located on the premises or to the cost of moving or relocating such personal property; only the real property has been considered.

15. The current purchasing power of the dollar is the basis for the values stated in the appraisal; we have assumed that no extreme fluctuations in economic cycles will occur.

16. The values found herein is subject to these and to any other assumptions or conditions set forth in the body of this report but which may have been omitted from this list of Assumptions and Limiting Conditions.

17. The analyses contained in the report necessarily incorporate numerous estimates and assumptions regarding property performance, general and local business and economic

conditions, the absence of material changes in the competitive environment and other matters. Some estimates or assumptions, however, inevitably will not materialize, and unanticipated events and circumstances may occur; therefore, actual results achieved during the period covered by our analysis will vary from our estimates, and the variations may be material.

18. The Americans with Disabilities Act (ADA) became effective January 26, 1992. We have not made a specific survey or analysis of the property to determine whether the physical aspects of the improvements meet the ADA accessibility guidelines. We claim no expertise in ADA issues, and render no opinion regarding compliance of the subject with ADA regulations. Inasmuch as compliance matches each owner's financial ability with the cost to cure the non-conforming physical characteristics of a property, a specific study of both the owner's financial ability and the cost to cure any deficiencies would be needed for the Department of Justice to determine compliance.

19. The appraisal report is prepared for the exclusive benefit of the Client, its subsidiaries and/or affiliates. It may not be used or relied upon by any other party. All parties who use or rely upon any information in the report without our written consent do so at their own risk.

20. No studies have been provided to us indicating the presence or absence of hazardous materials on the subject property or in the improvements, and our valuation is predicated upon the assumption that the subject property is free and clear of any environment hazards including, without limitation, hazardous wastes, toxic substances and mold. No representations or warranties are made regarding the environmental condition of the subject property. Integra Realty Resources – Atlanta, Integra Realty Resources, Inc., Integra Strategic Ventures, Inc. and/or any of their respective officers, owners, managers, directors, agents, subcontractors or employees (the "Integra Parties"), shall not be responsible for any such environmental conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because we are not experts in the field of environmental conditions, the appraisal report cannot be considered as an environmental assessment of the subject property.

21. The persons signing the report may have reviewed available flood maps and may have noted in the appraisal report whether the subject property is located in an identified Special Flood Hazard Area. We are not qualified to detect such areas and therefore do not guarantee such determinations. The presence of flood plain areas and/or wetlands may affect the value of the property, and the value conclusion is predicated on the assumption that wetlands are non-existent or minimal.

22. Integra Realty Resources – Atlanta is not a building or environmental inspector. Integra Atlanta does not guarantee that the subject property is free of defects or environmental problems. Mold may be present in the subject property and a professional inspection is recommended.

23. The appraisal report and value conclusions for an appraisal assume the satisfactory completion of construction, repairs or alterations in a workmanlike manner.

24. It is expressly acknowledged that in any action which may be brought against any of the Integra Parties, arising out of, relating to, or in any way pertaining to this engagement, the

appraisal reports, and/or any other related work product, the Integra Parties shall not be responsible or liable for any incidental or consequential damages or losses, unless the appraisal was fraudulent or prepared with intentional misconduct. It is further acknowledged that the collective liability of the Integra Parties in any such action shall not exceed the fees paid for the preparation of the appraisal report unless the appraisal was fraudulent or prepared with intentional misconduct. Finally, it is acknowledged that the fees charged herein are in reliance upon the foregoing limitations of liability.

25. Integra Realty Resources – Atlanta, an independently owned and operated company, has prepared the appraisal for the specific intended use stated elsewhere in the report. The use of the appraisal report by anyone other than the Client is prohibited except as otherwise provided. Accordingly, the appraisal report is addressed to and shall be solely for the Client's use and benefit unless we provide our prior written consent. We expressly reserve the unrestricted right to withhold our consent to your disclosure of the appraisal report or any other work product related to the engagement (or any part thereof including, without limitation, conclusions of value and our identity), to any third parties. Stated again for clarification, unless our prior written consent is obtained, no third party may rely on the appraisal report (even if their reliance was foreseeable).

26. The conclusions of this report are estimates based on known current trends and reasonably foreseeable future occurrences. These estimates are based partly on property information, data obtained in public records, interviews, existing trends, buyer-seller decision criteria in the current market, and research conducted by third parties, and such data are not always completely reliable. The Integra Parties are not responsible for these and other future occurrences that could not have reasonably been foreseen on the effective date of this assignment. Furthermore, it is inevitable that some assumptions will not materialize and that unanticipated events may occur that will likely affect actual performance. While we are of the opinion that our findings are reasonable based on current market conditions, we do not represent that these estimates will actually be achieved, as they are subject to considerable risk and uncertainty. Moreover, we assume competent and effective management and marketing for the duration of the projected holding period of this property.

27. All prospective value opinions presented in this report are estimates and forecasts which are prospective in nature and are subject to considerable risk and uncertainty. In addition to the contingencies noted in the preceding paragraph, several events may occur that could substantially alter the outcome of our estimates such as, but not limited to changes in the economy, interest rates, and capitalization rates, behavior of consumers, investors and lenders, fire and other physical destruction, changes in title or conveyances of easements and deed restrictions, etc. It is assumed that conditions reasonably foreseeable at the present time are consistent or similar with the future.

28. The appraisal is also subject to the following:

## Extraordinary Assumptions and Hypothetical Conditions

The value conclusions are subject to the following extraordinary assumptions that may affect the assignment results. An extraordinary assumption is uncertain information accepted as fact. If the assumption is found to be false as of the effective date of the appraisal, we reserve the right to modify our value conclusions.

1. That the effective date of the appraisal, November 1, 2013, is prior to the differential soil settlement of the subject improvements.
2. That the property does not suffer from significant deferred maintenance based on the May 2, 2013 Drucker & Falk, LLC Maintenance Inspection.

The value conclusions are based on the following hypothetical conditions that may affect the assignment results. A hypothetical condition is a condition contrary to known fact on the effective date of the appraisal but is supposed for the purpose of analysis.

1. The market resistance (stigma) percentage estimate is applied to the value before the differential soil settlement but assumes the necessary repairs will be completed. Since the repairs had not be completed as of 11/1/2013, this is considered a Hypothetical Condition.

# Addendum A

## Appraiser Qualifications

# J. Carl Schultz, Jr., MAI, SRA, CRE, FRICS

Integra Realty Resources
Atlanta/Savannah

1100 Peachtree Street, NE
Suite 330
Atlanta, GA 30309

T 404.836.7922
F 404.897.[illegible]

irr.com

## Experience

Director/Principle of Integra Realty Resources - Atlanta, formerly part of Schultz, Carr, Bissette & Associates and Senior Managing Director of Integra Realty Resources - Savannah, GA. He is also a member of The Real Estate Counseling Group of America. Exclusively engaged in real estate consulting and valuation with more than 40 year's experience. Was formerly a Partner in Wight, Couch & Schultz, and Vice President of Landauer, a national appraisal and consulting firm.

Most recently has been working with international appraisal associations and government agencies in developing appraisal standards, education and regulations. These have included assignments in Poland, Russia, Ukraine, Slovakia, Hungary, Bulgaria, Armenia & Thailand.

Actively engaged in real estate valuation and consulting assignments including, but not limited to, shopping centers, office buildings, churches, industrial facilities, marinas, golf resorts, coastal islands, wetlands, marsh lands (easements), and residential subdivisions. Clients include banks and financial institutions, law firms, governments, insurance companies, and investors.

## Professional Activities & Affiliations

Counselor of Real Estate (CRE) American Society of Real Estate Counselors
Appraisal Institute, Member (MAI) Appraisal Institute
Atlanta Board of REALTORS
Georgia Association of REALTORS
National Association of REALTORS
Real Estate Counseling Group of America
Rho Epsilon National Real Estate Fraternity
Royal Institute of Chartered Surveyors, Fellow (FRICS) Royal Institution of Chartered Surveyors
Society of Golf Course Appraisers (SGA)
University of Georgia College of Business Administration; Distinguished Practitioning Lecturer 1975-76

## Licenses

Georgia, Certified Real Estate Appraiser, CG000818, Expires October 2015
Alabama, Certified General Real Property Appraiser, G000413, Expires September 2015
North Carolina, Certified General Real Estate Appraiser, A3851, Expires June 2016
South Carolina, Certified General Real Estate Appraiser, C469, Expires June 2016
Mississippi, Certified General Real Estate Appraiser, GA-776, Expires October 2015

## Education

Graduate of the University of Georgia in 1963. Received BBA Degree with major in Real Estate. Has attended numerous courses and taught appraisal courses nationally for the American Institute of Real Estate Appraisers, Society of Real Estate Appraisers, and the Appraisal Institute. Developed the initial National Professional Appraisal Standards course for the Appraisal Foundation.

## Qualified Before Courts & Administrative Bodies

Fulton County, Gwinnett County, DeKalb County, Chatham County, Cobb County, Muscogee County, Forsyth County, Georgia; Greenville, South Carolina; Chattanooga, TN; Scranton, PA; Albany, NY; New Orleans, LA; State of Georgia Public Service Commission

# STATE OF GEORGIA
# REAL ESTATE APPRAISERS BOARD

**JOHN CARL SCHULTZ, JR**

**818**

IS AUTHORIZED TO TRANSACT BUSINESS IN GEORGIA AS A

**CERTIFIED GENERAL REAL PROPERTY APPRAISER**

THE PRIVILEGE AND RESPONSIBILITIES OF THIS APPRAISER CLASSIFICATION SHALL CONTINUE IN EFFECT AS LONG AS THE APPRAISER PAYS REQUIRED APPRAISER FEES AND COMPLIES WITH ALL OTHER REQUIREMENTS OF THE OFFICIAL CODE OF GEORGIA ANNOTATED, CHAPTER 43-39-A. THE APPRAISER IS SOLELY RESPONSIBLE FOR THE PAYMENT OF ALL FEES ON A TIMELY BASIS.

D. SCOTT MURPHY
Chairperson

MARILYN R. WATTS
Vice Chairperson

RONALD M. HECKMAN
JEFF A. LAWSON
KEITH STONE

47301403

JOHN CARL SCHULTZ, JR

ORIGINALLY LICENSED 06/24/1991

# 818

Status ACTIVE

END OF RENEWAL 10/31/2015

CERTIFIED GENERAL REAL PROPERTY APPRAISER

THIS LICENSE EXPIRES IF YOU FAIL TO PAY RENEWAL FEES OR IF YOU FAIL TO COMPLETE ANY REQUIRED EDUCATION IN A TIMELY MANNER.

State of Georgia
Real Estate Commission
Suite 1000 - International Tower
229 Peachtree Street, N.E.
Atlanta, GA 30303-1605

WILLIAM L. ROGERS, JR.
Real Estate Commissioner

47301403

JOHN CARL SCHULTZ, JR

ORIGINALLY LICENSED 06/24/1991

# 818

Status ACTIVE

END OF RENEWAL 10/31/2015

CERTIFIED GENERAL REAL PROPERTY APPRAISER

THIS LICENSE EXPIRES IF YOU FAIL TO PAY RENEWAL FEES OR IF YOU FAIL TO COMPLETE ANY REQUIRED EDUCATION IN A TIMELY MANNER.

State of Georgia
Real Estate Commission
Suite 1000 - International Tower
229 Peachtree Street, N.E.
Atlanta, GA 30303-1605

WILLIAM L. ROGERS, JR.
Real Estate Commissioner

47301403

# Sherry L. Watkins, MAI, FRICS, ASA

Integra Realty Resources
Atlanta

1100 Peachtree Street, NE
Suite 350
Atlanta, GA 30309

T 404-897-1866
F 404-897-1053

irr.com

## Experience

Senior Managing Director/Principal for the Atlanta, GA office of Integra Realty Resources, the nation's largest national valuation and consulting firm. Primary responsibilities include managing staff of 12 analysts, valuation, market analysis, and consulting engagements involving multifamily, office, retail, industrial, manufacturing, land, subdivisions, and special use properties, for corporate clients, pension fund advisors, banks and financial institutions, developers and investors, law firms, government, life insurance companies, and individuals. Also completes valuations of hotels, car washes, gas stations, and other going concerns. Actively engaged in real estate valuation and consulting assignments since the late 1980s. Specialty is multifamily properties including: market rent properties, affordable housing, and valuations for Fannie Mae DUS, Freddie Mac, and HUD. Ms. Watkins is MAP certified.

Prior work experience includes Managing Director at PGP Valuation Inc./Colliers International and Associate Director at Cushman & Wakefield. Senior Appraiser at C. Spencer Powell/RSP Associates and Oregon Department of Revenue.

## Professional Activities & Affiliations

Appraisal Institute Atlanta Chapter LDAC Attendee Years 1 and 2
Appraisal Institute Atlanta Chapter 2016 Treasurer
Member: Appraisal Institute (MAI)
Member: Royal Institution of Chartered Surveyors (FRICS)
Member: CREW
Member: American Society of Appraisers (ASA - Accredited Senior Appraiser)
Former Appraisal Institute Regional Representative
Former Appraisal Institute Atlanta Chapter Board of Directors
Former Appraisal Institute General Admissions Chairman

## Licenses

Alabama, Certified Real Estate Appraiser, G00613, Expires September 2015
Florida, Certified General Real Estate Appraiser, RZ3004, Expires November 2015
Georgia, Certified General Real Estate Appraiser, CG001536, Expires September 2015
Louisiana, Certified General Real Estate Appraiser, G3735, Expires December 2015
Mississippi, Certified General Real Estate Appraiser, GA-1052, Expires November 2016
South Carolina, Certified General Real Estate Appraiser, CG4578, Expires June 2016
Tennessee, Certified General Real Estate Appraiser, 00003563, Expires November 2015

## Education

Bachelor of Science in Business Administration, Georgia State University, Atlanta, Georgia.

Completed all courses required by the Appraisal Institute for MAI designation as well as numerous real estate related courses and seminars. Currently certified by the Appraisal Institute's voluntary program of continuing education for its designated members. Completed HUD Multifamily Accelerated Processing (MAP).

Recently completed AI - Fundamentals of Separating Real Property, Personal Property, FF&E, Uniform Appraisal Standards for Federal Land Acquisitions, Complex Litigation

swatkins@irr.com - 404-836-7925

# Sherry L. Watkins, MAI, FRICS, ASA

## Education (Cont'd)

Appraisal Case Studies, and Conservation Easements & Your Taxes.

Recently completed ASA - BV 201 Introduction to Business Valuation and Allocation of Going Concerns.

## Qualified Before Courts & Administrative Bodies

Qualified as an expert witness in various courts and administrative bodies including U.S Federal Bankruptcy Court, and Superior Courts in Bibb, Cobb, DeKalb, Fulton, Gwinnett, Douglas, Dawson, and Henry Counties in Georgia.

## Miscellaneous

Featured as a Women of Influence 2010 in the Real Estate Forum July/August 2010.

Is an IRR Certified Reviewer.

Integra Realty Resources
Atlanta

1100 Peachtree Street, NE
Suite 350
Atlanta, GA 30309

T 404-897-1866
F 404-897-1053

irr.com

swatkins@irr.com - 404-836-7925

irr

# STATE OF GEORGIA
# REAL ESTATE APPRAISERS BOARD

SHERRY LYNN WATKINS

**1536**

IS AUTHORIZED TO TRANSACT BUSINESS IN GEORGIA AS A

## CERTIFIED GENERAL REAL PROPERTY APPRAISER

THE PRIVILEGE AND RESPONSIBILITIES OF THIS APPRAISER CLASSIFICATION SHALL CONTINUE IN EFFECT AS LONG AS THE APPRAISER PAYS REQUIRED APPRAISER FEES AND COMPLIES WITH ALL OTHER REQUIREMENTS OF THE OFFICIAL CODE OF GEORGIA ANNOTATED, CHAPTER 43-39-A. THE APPRAISER IS SOLELY RESPONSIBLE FOR THE PAYMENT OF ALL FEES ON A TIMELY BASIS.

D. SCOTT MURPHY
Chairperson

MARILYN R. WATTS
Vice Chairperson

RONALD M. HECKMAN
JEFF A. LAWSON
KEITH STONE

46530754

**SHERRY LYNN WATKINS**

**#** 1536
**Status** ACTIVE

**CERTIFIED GENERAL REAL PROPERTY APPRAISER**

**ORIGINALLY LICENSED**
08/09/1991

**END OF RENEWAL**
09/30/2015

THIS LICENSE EXPIRES IF YOU FAIL TO PAY RENEWAL FEES OR IF YOU FAIL TO COMPLETE ANY REQUIRED EDUCATION IN A TIMELY MANNER.

State of Georgia
Real Estate Commission
Suite 1000 - International Tower
229 Peachtree Street, N.E.
Atlanta, GA 30303-1605

STATE OF GEORGIA 1776

WILLIAM L. ROGERS, JR.
Real Estate Commissioner

46530754

**SHERRY LYNN WATKINS**

**#** 1536
**Status** ACTIVE

**CERTIFIED GENERAL REAL PROPERTY APPRAISER**

**ORIGINALLY LICENSED**
08/09/1991

**END OF RENEWAL**
09/30/2015

THIS LICENSE EXPIRES IF YOU FAIL TO PAY RENEWAL FEES OR IF YOU FAIL TO COMPLETE ANY REQUIRED EDUCATION IN A TIMELY MANNER.

State of Georgia
Real Estate Commission
Suite 1000 - International Tower
229 Peachtree Street, N.E.
Atlanta, GA 30303-1605

STATE OF GEORGIA 1776

WILLIAM L. ROGERS, JR.
Real Estate Commissioner

46530754

# Integra Realty Resources, Inc.
# Corporate Profile

Integra Realty Resources, Inc. offers the most comprehensive property valuation and counseling coverage in the United States with 62 independently owned and operated offices in 34 states and the Caribbean. Integra was created for the purpose of combining the intimate knowledge of well-established local firms with the powerful resources and capabilities of a national company. Integra offers integrated technology, national data and information systems, as well as standardized valuation models and report formats for ease of client review and analysis. Integra's local offices have an average of 25 years of service in the local market, and all but one are headed by a Senior Managing Director who is an MAI member of the Appraisal Institute.

A listing of IRR's local offices and their Senior Managing Directors follows:

*ATLANTA, GA - Sherry L. Watkins., MAI, FRICS*
*AUSTIN, TX - Randy A. Williams, MAI, SR/WA, FRICS*
*BALTIMORE, MD - G. Edward Kerr, MAI, MRICS*
*BIRMINGHAM, AL - Rusty Rich, MAI, MRICS*
*BOISE, ID - Bradford T. Knipe, MAI, ARA, CCIM, CRE, FRICS*
*BOSTON, MA - David L. Cary, Jr., MAI, MRICS*
*CHARLESTON, SC - Cleveland "Bud" Wright, Jr., MAI*
*CHARLOTTE, NC - Fitzhugh L. Stout, MAI, CRE, FRICS*
*CHICAGO, IL - Eric L. Enloe, MAI, FRICS*
*CINCINNATI, OH - Gary S. Wright, MAI, FRICS, SRA*
*CLEVELAND, OH - Douglas P. Sloan, MAI*
*COLUMBIA, SC - Michael B. Dodds, MAI, CCIM*
*COLUMBUS, OH - Bruce A. Daubner, MAI, FRICS*
*DALLAS, TX - Mark R. Lamb, MAI, CPA, FRICS*
*DAYTON, OH - Gary S. Wright, MAI, FRICS, SRA*
*DENVER, CO - Brad A. Weiman, MAI, FRICS*
*DETROIT, MI - Anthony Sanna, MAI, CRE, FRICS*
*FORT WORTH, TX - Gregory B. Cook, SR/WA*
*GREENSBORO, NC - Nancy Tritt, MAI, SRA, FRICS*
*GREENVILLE, SC - Michael B. Dodds, MAI, CCIM*
*HARTFORD, CT - Mark F. Bates, MAI, CRE, FRICS*
*HOUSTON, TX - David R. Dominy, MAI, CRE, FRICS*
*INDIANAPOLIS, IN - Michael C. Lady, MAI, SRA, CCIM, FRICS*
*JACKSON, MS - J. Walter Allen, MAI, FRICS*
*JACKSONVILLE, FL - Robert Crenshaw, MAI, FRICS*
*KANSAS CITY, MO/KS - Kenneth Jaggers, MAI, FRICS*
*LAS VEGAS, NV - Charles E. Jack IV, MAI*
*LOS ANGELES, CA - John G. Ellis, MAI, CRE, FRICS*
*LOS ANGELES, CA - Matthew J. Swanson, MAI*
*LOUISVILLE, KY - Stacey Nicholas, MAI, MRICS*
*MEMPHIS, TN - J. Walter Allen, MAI, FRICS*
*MIAMI/PALM BEACH, FL - Scott M. Powell, MAI, FRICS*
*MIAMI/PALM BEACH, FL- Anthony M. Graziano, MAI, CRE, FRICS*
*MINNEAPOLIS, MN - Michael F. Amundson, MAI, CCIM, FRICS*
*NAPLES, FL - Carlton J. Lloyd, MAI, FRICS*
*NASHVILLE, TN - R. Paul Perutelli, MAI, SRA, FRICS*
*NEW JERSEY COASTAL - Halvor J. Egeland, MAI*
*NEW JERSEY NORTHERN - Barry J. Krauser, MAI, CRE, FRICS*
*NEW YORK, NY - Raymond T. Cirz, MAI, CRE, FRICS*
*ORANGE COUNTY, CA - Larry D. Webb, MAI, FRICS*
*ORLANDO, FL - Christopher Starkey, MAI, MRICS*
*PHILADELPHIA, PA - Joseph D. Pasquarella, MAI, CRE, FRICS*
*PHOENIX, AZ - Walter 'Tres' Winius III, MAI, FRICS*
*PITTSBURGH, PA - Paul D. Griffith, MAI, CRE, FRICS*
*PORTLAND, OR - Brian A. Glanville, MAI, CRE, FRICS*
*PROVIDENCE, RI - Gerard H. McDonough, MAI, FRICS*
*RALEIGH, NC - Chris R. Morris, MAI, FRICS*
*RICHMOND, VA - Kenneth L. Brown, MAI, CCIM, FRICS*
*SACRAMENTO, CA - Scott Beebe, MAI, FRICS*
*ST. LOUIS, MO - P. Ryan McDonald, MAI, FRICS*
*SALT LAKE CITY, UT - Darrin W. Liddell, MAI, CCIM, FRICS*
*SAN ANTONIO, TX - Martyn C. Glen, MAI, CRE, FRICS*
*SAN DIEGO, CA - Jeff A. Greenwald, MAI, SRA, FRICS*
*SAN FRANCISCO, CA - Jan Kleczewski, MAI, FRICS*
*SARASOTA, FL - Carlton J. Lloyd, MAI, FRICS*
*SAVANNAH, GA - J. Carl Schultz, Jr., MAI, FRICS, CRE, SRA*
*SEATTLE, WA - Allen N. Safer, MAI, MRICS*
*SYRACUSE, NY - William J. Kimball, MAI, FRICS*
*TAMPA, FL - Bradford L. Johnson, MAI, MRICS*
*TULSA, OK - Robert E. Gray, MAI, FRICS*
*WASHINGTON, DC - Patrick C. Kerr, MAI, SRA, FRICS*
*WILMINGTON, DE - Douglas L. Nickel, MAI, FRICS*
*CARIBBEAN/CAYMAN ISLANDS - James Andrews, MAI, FRICS*

**Corporate Office**
1133 Avenue of the Americas, 27th Floor, New York, New York 10036
Telephone: (212) 255-7858; Fax: (646) 424-1869; E-mail info@irr.com
Website: www.irr.com

irr

# Addendum B

## Comparison of Report Formats

## Comparison of Report Formats

| Reporting Options in 2014-2015 Edition of USPAP | Integra Reporting Formats Effective January 1, 2014 | Corresponding Reporting Options in 2012-2013 Edition of USPAP |
|---|---|---|
| Appraisal Report | Appraisal Report – Comprehensive Format | Self-Contained Appraisal Report |
| | Appraisal Report – Standard Format | Summary Appraisal Report |
| | Appraisal Report – Concise Summary Format | Minimum Requirements of Summary Appraisal Report |
| Restricted Appraisal Report | Restricted Appraisal Report | Restricted Use Appraisal Report |

### USPAP Reporting Options

The 2014-2015 edition of USPAP requires that all written appraisal reports be prepared under one of the following options: Appraisal Report or Restricted Appraisal Report.

An Appraisal Report summarizes the information analyzed, the appraisal methods employed, and the reasoning that supports the analyses, opinions, and conclusions. The requirements for an Appraisal Report are set forth in Standards Rule 2-2 (a) of USPAP.

A Restricted Appraisal Report states the appraisal methods employed and the conclusions reached but is not required to include the data and reasoning that supports the analyses, opinions, and conclusions. Because the supporting information may not be included, the use of the report is restricted to the client, and further, the appraiser must maintain a work file that contains sufficient information for the appraiser to produce an Appraisal Report if required. The requirements for a Restricted Appraisal Report are set forth in Standards Rule 2-2 (b).

### Integra Reporting Formats under the Appraisal Report Option

USPAP gives appraisers the flexibility to vary the level of information in an Appraisal Report depending on the intended use and intended users of the appraisal. Accordingly, Integra Realty Resources has established internal standards for three alternative reporting formats that differ in depth and detail yet comply with the USPAP requirements for an Appraisal Report. The three Integra formats are:

- Appraisal Report – Comprehensive Format
- Appraisal Report – Standard Format
- Appraisal Report – Concise Summary Format

An Appraisal Report – Comprehensive Format has the greatest depth and detail of the three report types. It describes and explains the information analyzed, the appraisal methods employed, and the reasoning that supports the analyses, opinions, and conclusions. This format meets or exceeds the former Self-Contained Appraisal Report requirements that were contained in the 2012-2013 edition of USPAP.

An Appraisal Report – Standard Format has a moderate level of detail. It summarizes the information analyzed, the appraisal methods employed, and the reasoning that supports the analyses, opinions, and conclusions. This format meets or exceeds the former Summary Appraisal Report requirements that were contained in the 2012-2013 edition of USPAP.

An Appraisal Report - Concise Summary Format has less depth and detail than the Appraisal Report – Standard Format. It briefly summarizes the data, reasoning, and analyses used in the appraisal process while additional supporting documentation is retained in the work file. This format meets the minimum requirements of the former Summary Appraisal Report that were contained in the 2012-2013 edition of USPAP.

On occasion, clients will request, and Integra will agree to provide, a report that is labelled a Self-Contained Appraisal Report. Other than the label, there is no difference between a Self-Contained Appraisal Report and an Appraisal Report - Comprehensive Format. Both types of reports meet or

exceed the former Self-Contained Appraisal Report requirements set forth in the 2012-2013 edition of USPAP.

### Integra Reporting Format under Restricted Appraisal Report Option

Integra provides a Restricted Appraisal Report format under the USPAP Restricted Appraisal Report option. This format meets the requirements of the former Restricted Use Appraisal Report that were contained in the 2012-2013 edition of USPAP.

# Addendum C

## Financials and Property Information